Joshua A. Ridless (SBN 195413)
Ridless Law Office
500 Washington Street, Suite 700
San Francisco, CA 94111
Telephone (415) 614-2600
Facsimile (415) 480-1398
jr@ridlesslaw.com


Attorney for Plaintiff, Dan Nguyen

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


| | |
|---|---|
| DAN NGUYEN,<br><br>          Plaintiff,<br><br>     vs.<br><br>MARGARET P. CHOW, an individual, MCC INVESTMENTS, INC., dba SpeeDee Oil Change & Tune-Up, a California corporation, THOMAS K. LOI, an individual, and DOES 1-20, inclusive,<br><br>          Defendants. | ) Case No.:<br>)<br>) COMPLAINT FOR (1) BREACH OF<br>) FIDUCIARY DUTY; (2) CONVERSION;<br>) (3) BREACH OF CONTRACT; (4)<br>) BREACH OF THE IMPLIED COVENANT<br>) OF GOOD FAITH AND FAIR DEALING;<br>) (5) FRAUD; (6) ACCOUNTING; (7)<br>) JUDICIAL DISSOLUTION OF<br>) CORPORATION; (8) UNJUST<br>) ENRICHMENT; (9)COMMON COUNTS;<br>) (10) QUANTUIM MERUIT; (11)<br>) WRONGFUL TERMINATION; (12)<br>) INTENTIONAL INFLICTION OF<br>) EMOTIONAL DISTRESS; (13)  &<br>) (14) CIVIL VIOLATION OF RICO<br>) (18 U.S.C. 1962 (a)-(d)).<br>)<br>) DEMAND FOR JURY TRIAL<br>)<br>) |

     Plaintiff Dan Nguyen brings this action against defendants

Margaret P. Chow, an individual, Thomas K. Loi, an individual,

MCC Investments, Inc., a California corporation dba SpeeDee Oil

1

Change & Tune-Up (hereafter sometimes referred to as "MCC"), and DOES 1-20, and each of them, and alleges:

## GENERAL ALLEGATIONS

1.   Plaintiff Dan Nguyen (sometimes referred to as Plaintiff or Mr. Nguyen) is an individual residing in the City and County of San Francisco, California.

2.   Defendant MCC's principal executive office is or was located at 93 San Jacinto Way, in San Francisco.  On information and belief, Plaintiff alleges that this is also the residence of Defendant Chow. Defendant Chow is listed with the California Secretary of State as the CEO of MCC.

3.   Plaintiff alleges on information and belief that Defendant Thomas K. Loi is a resident of the City and County of San Francisco.

4.   Plaintiff is a licensed and highly accomplished mechanic with over 25 years of automotive experience.  From 1989-1995, Mr. Nguyen was the owner and operator of an Econolube N Tune franchise in Fremont, CA; from 1995-2001, Mr. Nguyen owned and operated an All Tune N Lube franchise in Montgomery County, Texas; from 2001-2010 Mr. Nguyen worked for Toyota in Fremont, initially as a quality control specialist, until he was promoted to quality control supervisor, a position titled "Group Leader"; and from 2010 to 2011 Mr. Nguyen worked for Chrysler Group in Auburn Hills as the Corporate Quality Auditor for new models. Mr. Nguyen holds or has held a smog inspector license, a

freon license, an ASE brake license, certificates for electronic engine control and trouble shooting, exhaust system and engine diagnostics, and suspension, among other automotive certificates and licenses.

5.   Mr. Nguyen and Defendant Chow have known of each other since approximately 1989, and had been friends prior to the events complained of herein.

6.   Plaintiff alleges on information and belief, that Defendant Chow's primary employment is as a sales person at Shreve & Company.

7.   On or about May 11, 2012, Defendant Chow called Mr. Nguyen, and asked him to go to dinner to discuss a business opportunity. Defendant Chow desired to purchase a SpeeDee Oil Change & Tune-Up franchise located in Millbrae, California (the "Franchise") from Mr. Michael Mak.

8.   Plaintiff alleges on information and belief, that Mr. Mak is the god-son of Defendant Chow, or some other similar deep familial, or quasi-familial relationship.

9.   A week or so later, Defendant Chow had Mr. Mak and Mr. Nguyen over to her home to discuss the purchase of one of Mr. Mak's franchises.   Mr. Mak had said that he inherited the franchises from his father, but needed to sell one as managing all three was too much of a demand for him to handle.

10.   Subsequently, Mr. Nguyen spent about a week at the Franchise to determine if he wanted to join Defendant Chow in pursuing this business opportunity.

11.   Mr. Nguyen reported back to Defendant Chow that he believed this was a good business opportunity.   A few days later, Mr. Nguyen met with a man named Raymond, who represented himself to be Defendant Chow's long time financial advisor, for an informal interview to do due diligence on Mr. Nguyen. There were several other people at this meeting as well, including Defendant Loi.

12.   Raymond told the group that he believed Mr. Nguyen was qualified and the right person to partner with in purchasing Mr. Mak's Franchise.

13.   Plaintiff alleges on information and belief, that Mr. Mak owned the Franchise through an entity Mr. Mak controlled, thought Plaintiff does not recall the name of the entity, and that Mr. Mak owns or owned at least three Speedee franchises including Millbrae, San Bruno and Fair Oaks, California.

14.   Mr. Mak had a personal bookkeeper, a woman named Malou, who handled all three franchise locations.

15.   Ms. Linda Diane Lowe is Mr. Mak's CPA and prepares and files the Mr. Mak's franchises' tax returns franchise reports. Ms. Lowe also acted as the CPA for MCC at all times referenced herein, reporting to Defendant Chow, but not to Mr. Nguyen.

16.   Defendant Chow offered Mr. Nguyen a twenty percent (20%) interest in an entity which would purchase the Franchise, in consideration for Mr. Nguyen using his expert automotive qualifications and management experience to manage the business operations of the Franchise, and promised Mr. Nguyen that he would have full control of the Franchise's operations.

17.   Plaintiff alleges on information belief, that all of Ms. Lowe's actions relating to MCC, referenced herein, were done at the instruction of Defendant Chow.  Ms. Lowe formed MCC in June of 2012.  Ms. Lowe stated she would obtain all necessary licenses and submit all required paperwork for the corporation.[1]

18.   Mr. Nguyen did not in any way supervise or instruct Ms. Lowe as to how the prepare and file MCC's corporate documents.

19.   Beginning on or about June 8, 2012, Mr. Nguyen took over management of the Franchise's operations.

20.   Defendant Chow represented to Mr. Nguyen that they now owned the Franchise, but that the finances would continue to be run through Mr. Mak's entity until SpeeDee WorldWide Corporation, a Delaware corporation (the "Franchisor") approved the sale of the Franchise.

21.   Plaintiff alleges on information and belief, that Mr. Mak and Defendant Chow had some agreement as to who the revenues

---

[1] Attached as Exhibit A are true and correct copies of corporate documents prepared, executed and filed by Ms. Lowe, with the California Secretary of State.

and expenses were to be treated during this transition period, which agreement was never made known to Mr. Nguyen.

22. From on or about June 8, 2012 through about April 1, 2013, all of the Franchise's finances continued to be run through Mr. Mak's entity's books and financial accounts, which were handled by Malou and Ms. Lowe.

23. Mr. Mak and Defendant Chow insisted that Mr. Nguyen be paid as independent contractor instead of an employee.

24. During this same period, Mr. Mak would regularly have about a dozen pre-signed checks delivered to Mr. Nguyen each week so that Mr. Nguyen could pay the Franchise's vendors. At the end of this period.

25. Mr. Nguyen later discovered that the Franchise's vendors were not all paid in full for services/products delivered during this period and MCC never received the revenues generated during this period.

26. On or about March 15, 2013, Mr. Nguyen, Defendant Chow, Defendant MCC and the Franchisor entered into the franchise agreement, which was dated January 1, 2013, granting the rights to Franchise to MCC (the "Franchise Agreement")[2], in part, in reliance on the representation by MCC and Defendant Chow, that Mr. Nguyen would be a twenty percent (20%) of MCC and would run the operations of the Franchise.

---

[2] A true and correct copy of the Franchise Agreement is attached hereto as Exhibit B and incorporated herein by reference.

6

27.   The Franchise Agreement, signed by Defendant Chow, on behalf of herself and MCC, also explicitly states that Mr. Nguyen holds a twenty percent (20%) ownership stake in MCC. (See Exhibit B, Franchise Agreement (at p. 43 (Ex. C)).

28.   Subsequent to the signing of the Franchise Agreement, Defendant Chow began giving her son, Mr. Eric Chow, more and greater responsibilities at the Franchise.   Then, on or about May 16, 2013, Mr. Chow told Mr. Nguyen that he was no longer the manager of the Franchise, that he was now the greeter, that he had a new desk, that Mr. Chow was the new manager of the Franchise, and that Mr. Nguyen's office was now Mr. Chow's office.

29.   Mr. Chow then held a staff-wide meeting, announced the same, and told all staff that they now reported to him and not to Mr. Nguyen.

30.   Further, Mr. Chow took Mr. Nguyen off the Franchise Work Schedule.[3]

31.   At about this time, Mr. Nguyen's check writing authority with the Franchise's East West Bank, were revoked, along with his ability to view accounts online, and attempts to use his Franchise credit card were declined.

32.   Defendant Chow and Defendant Loi are companions. Plaintiff alleges on information and belief, that (i) Defendant Loi purported to be a former San Francisco Police Officer, (ii)

---

[3] Attached as Exhibit C is a true and correct copy of the Franchise Work Schedule for the week of 5/16/13, which is incorporated herein by reference.

7

he currently works as an enforcer and collector for Defendant Chow, local gambling houses and massage parlors, (iii) he gambles regularly, and (iv) has a gambling problem.

33.   Defendant Loi regularly entered and hung around the Franchise, smoking cigars, often harassing customers, some of whom later lodged complaints with the Franchisor, harassing Mr. Nguyen, generally interfering with the Franchise's operations, acting as if he had authority at the Franchise, which he did not, and frequently demanding that Mr. Nguyen given him cash from the register, and did in fact regularly take cash from the business, without the consent of Mr. Nguyen.

34.   On or about November 9, 2012, Mr. Loi withdrew approximately $5,000.00 against the Franchise's Visa account.

35.   On one occasion, Defendant Loi demanded that Mr. Nguyen give him $10,000.00 as "admission fees" and $2,000.00 per month "salary" for Defendant Loi's "work and support".

36.   Defendant Loi often invited his friends to the Franchise and once stated to Mr. Nguyen, that, "my friend here is China town's gangster", and warned Mr. Nguyen not to mess with him.

37.   Defendant Loi would have repairs performed on his friends' vehicles and would heavily discount the invoice or tell workers not charge at all.

38.   One time, Defendant Loi shredded the repair work orders for his friend's vehicle.

39.  On several occasions, Defendant Loi showed Mr. Nguyen bundles of cash, which Defendant Loi stated totaled $100,000.00 or more.

40.  On or about March 13, 2013, Defendant Loi took one of the Franchise's checks, which was pre-signed by Mr. Mak, wrote it out tom himself for $4,000.00, and cashed the check at the San Francisco branch of East West Bank.[4]

41.  Mr. Nguyen was contacted by Ms. Anita Wong, the branch manager for East West Bank, concerning the misappropriated check.  Ms. Wong asked if this check was legitimate.  Mr. Nguyen told her that Mr. Loi was Ms. Chow's boyfriend, but was too concerned for his safety to tell Ms. Wong that the check had been misappropriated.  Mr. Nguyen immediately texted Defendant Chow a copy of check, but Defendant Chow did not respond to him.

42.  Subsequently, on several occasions following this incident, Defendant Loi would call Mr. Nguyen a snitch and say something to the effect of "you know what we do with snitches".

43.  When Mr. Nguyen would complain of Defendant Loi's acts to Defendant Loi, Defendant Loi would intimidate him with both posture and words of violence.  Mr. Loi threatened Mr. Nguyen with bodily harm.  Mr. Nguyen believed Mr. Loi's threats to be credible, and was intimidated and concerned for his safety.

44.  When Mr. Nguyen would complain of Mr. Loi's acts to Defendant Chow, Defendant Chow would take no action. Plaintiff

---

[4] A true and correct copy of the misappropriated check is attached hereto as Exhibit D, which is incorporated herein by reference.

alleges on information and belief, that all the acts of Defendant Loi referenced herein, were done with the consent and at the instruction of Defendant Chow and that the two formed a civil conspiracy with respect to all acts alleged of either of them throughout this complaint.

45. On or about On February 1, 2013, Mr. Mike Guasch, the Franchisor's Director of Operations for the Western Division, paid a surprise visit to the Franchise and witnessed threats made by Mr. Loi to Mr. Nguyen and to Mr. Guasch that, "I can burn this shop all down if I wanted to".

46. Plaintiff alleges on information and belief, that Mr. Guasch reported this incident back to Mr. Dan Zook, Franchisor's V.P. of Operations.

47. On July 9th 2013, at approximately 7:00 am, Defendant Chow called Mr. Nguyen and asked that he come to her home.

48. Shortly after Mr. Nguyen arrived Defendant Chow complained that the Franchise's bills were not being paid. Mr. Nguyen advised, that, as Ms. Chow was aware, Mr. Mak had control over all the Franchise's accounts, except for utilities, and that because the Franchise never received the all revenues accrued from June 2012 through April 1, 2013, it did not have the cash flow to stay on top of vendor invoices.

49. Plaintiff alleges on information and belief, that Defendant Chow shared in these revenues with Mr. Mak, to the detriment of MCC, the Franchise and Mr. Nguyen.

50.   Defendant Chow stated she was putting her son, Mr. Eric Chow, in charge of the Franchise.

51.   Defendant Chow then presented Mr. Nguyen with a document entitled "Release of Interest in Franchise Business of MCC Investments, Inc. dba Speedee Oil Change & Tune Up" (the "Release") which purported to transfer all Mr. Nguyen's equity in MCC to Defendant Chow, with little to no consideration in return.[5]

52.   When Mr. Nguyen refused to sign the document, Mr. Chow expressed anger and he and Defendant Chow terminated him and warned me not show up at the Franchise anymore.

53.   Mr. Nguyen then left Defendant Chow's home, called the Franchise, spoke to Defendant Chow's daughter, Ms. Cory Chow, told Ms. Chow that he was just terminated and had not been paid for two days' work. Ms. Chow told him to come to the Franchise and pick up a check, which he did.

54.   Around noon on the same day, Defendant Chow called Mrs. Susan Nguyen, Mr. Nguyen's wife, at home, in a further attempt to intimidate Mr. Nguyen to sign the Release and stated, "I don't want Tom Loi to get involved", warning Mrs. Nguyen, "I don't want anybody to get hurt!".

55.   Approximately two months later, Ms. Lowe called Mr. Nguyen and asked to meet him at the San Bruno Appleby's for

---

[5] Attached as Exhibit E is a true and correct copy of the "Release of Interest in Franchise Business of MCC Investments, Inc. dba Speedee Oil Change & Tune Up", which is incorporated herein by reference.

lunch to discuss the dispute and Mr. Nguyen's interests in MCC and the Franchise.

56.   When they met, Ms. Lowe offered Mr. Nguyen $10,000.00, on behalf of Defendant Chow, to sign the Release and transfer his interests to Mr. Eric Chow.  Mr. Nguyen rejected this offer.

57.   The next day, Ms. Lowe drove over to Mr. Nguyen's place of work, and relayed an increased offer of $20,000.00 to sign his interests over to Mr. Eric Chow.  Mr. Nguyen rejected this offer.

58.   Unbeknownst to Plaintiff, on June 27, 2013, without noticing either a shareholder meeting or board of directors meeting, and without the possibility of a quorum for a board of directors meeting, Ms. Lowe filed a Statement of Information for MCC, with the California Secretary of State, removing Mr. Nguyen as a director, Corporate Secretary and agent for service of process, and changing the principle executive office of MCC, all without the consent or knowledge of Mr. Nguyen.

59.   Around late July 2013, Mr. Loi sent Mr. Nguyen a text disparaging him, further intimidating Mr. Nguyen.

60.   Defendant Chow subsequently cut off all communications of substance with Mr. Nguyen, and refused to allow him access to or grant him information concerning MCC.

61.   From approximately June 11, 2012, through the end of 2012, the Franchise's gross sales were up 70% year over year and

the car count was up 25%.[6]  This was all during the period in which Mr. Nguyen managed the operations of the Franchise and was directly attributable to Mr. Nguyen's expertise and management.

62.  Further, the Franchise scored its first 100% score, on two occasions, through Franchisor's secret shopper program (during the last quarter of 2012 and the first quarter of 2013). According to the Franchisor, the Franchise had not scored 100% at that location for many years.

63.  Prior to Defendant Chow locking Mr. Nguyen out of the Franchise, Mr. Dan Zook, Franchisor's Vice President of Operations, travelled to the Franchise, from his Chicago office, to mediate the situation between Mr. Nguyen and Defendant Chow. Mr. Loi showed up as well and became an obstacle. Mr. Guasch, and Mr. Jon Brown, District Manager for Franchisor, were also were present.

64.  At the meeting Mr. Zook told Defendant Chow that Franchisor was not simply seeking to award franchises to those with the investment capital, and made it clear that without Mr. Nguyen's management there would be no deal and no franchise.

65.  Plaintiff alleges on information and belief, that Defendant Chow's offer granting Mr. Nguyen twenty percent (20%) of MCC was made without any intention of ever honoring Mr. Nguyen's rights as a shareholder or partner and solely for the purpose of fraudulently inducing Franchisor to enter into the

---

[6] Attached as Exhibit F is a true and correct copy of an email correspondence from Mr. Jon Brown, District Manager for Franchisor, which is incorporated herein by reference.

Franchise Agreement and fraudulently inducing Mr. Nguyen to agree to lend his expertise to the management of the Franchise and name to the transaction.

66.  Plaintiff alleges on information and belief, that, since Defendant Chow locked Mr. Nguyen out of the business, she has engaged family members to operate the Franchise and the Franchise's revenues have dropped dramatically due to their poor management and lack of qualifications.

67.  Plaintiff also alleges on information and belief that Defendant Chow has accepted cash and checks deposited to her personal accounts for services rendered with the Franchise's assets and parts, and kept the same for her own personal benefit to the detriment of the Franchise, MCC, Mr. Nguyen and the Franchisor.

68.  On information and belief, Plaintiff alleges that Mr. Rafael, Defendant Chow's co-worker at Shreve and Co., paid over $2,000.00 directly to Defendant Chow for repairs performed at the Franchise.  On information and belief, Plaintiff alleges that this transaction was not reported.

69.  Defendant Chow has refused to provide Mr. Nguyen with any financial or corporate records of MCC.

70.  Defendant Chow has refused to remit any profits of MCC to Mr. Nguyen.

71.  Plaintiff alleges on information and belief, that MCC is the alter ego of Defendant Chow, that Defendant Chow has

commingled her own funds and assets with those of MCC's, that Defendant Chow has embezzled funds from MCC for her own personal benefit, and that Defendant Chow has failed to observe corporate formalities for MCC, such that there is no distinguishable difference between MCC and Defendant Chow.

72. On information and belief, Plaintiff alleges that Defendant Chow is and at all times was an officer, director and majority shareholder of MCC, and at all times referenced herein, controlled MCC.

73. This court has federal question jurisdiction. The amount in controversy exceeds $75,000.

## **FIRST CAUSE OF ACTION**

### **(BREACH OF FIDUCIARY DUTY)**

74. Plaintiff repleads, realleges, and repeats verbatim each and every allegation stated in Paragraphs 1-73 of this Complaint, as though fully stated herein, and complains of defendant Chow and does one through twenty as follows:

75. Defendant Chow had and has a fiduciary duty to Mr. Nguyen, a minority shareholder.

76. Defendant Chow breached this duty as set forth above.

77. As a direct and proximate result of defendants' breach of the Agreement, plaintiff has been damaged in an amount to be determined at trial.

WHEREFORE, plaintiff prays for relief as set forth hereinafter.

## SECOND CAUSE OF ACTION

### (Conversion)

78. Plaintiff repleads, realleges, and repeats verbatim each and every allegation stated in Paragraphs 1-73 of this Complaint, as though fully stated herein, and complains of defendant Chow, MCC and does one through twenty as follows:

79. At all times herein mentioned, Plaintiff was, and still is, entitled to possession of various assets, profits, properties and benefits of MCC as more fully alleged above. Defendants have willfully interfered with the right of Plaintiff to possession of the assets, profits, properties and benefits of MCC and Defendants have converted same for their own use and benefit.

80. The value of the profits and assets converted is in an amount to be proven at trial.

81. As a proximate result of the foregoing, Plaintiff has been damaged in an amount equal to the value of the converted property plus interest and incidental expenses incurred in trying to recover the property, including but not limited to attorney fees and legal costs pursuant to Civil Code Section 3336.

82. Defendants' acts, as alleged above, were willful, wanton, malicious, and oppressive, and were undertaken with the intent to defraud, and justify the awarding of exemplary and punitive damages.

1    WHEREFORE, plaintiff prays for relief as set forth
2  hereinafter.

3                      **THIRD CAUSE OF ACTION**

4                       **(Breach of Contract)**

5    83.  Plaintiff repleads, repeats verbatim, and incorporates
6  each and every allegation appearing at Paragraphs 1-73 of this
7  Complaint, as though fully stated herein, and complains of each
8  named defendant and does one through twenty as follows:

9    84.  Defendants entered into contract with Plaintiff
10 whereby Plaintiff would receive a 20% stake in MCC, would
11 receive all the benefits of a shareholder in MCC, would run the
12 operations of the franchise and would receive a regular salary
13 for the same.

14   85.  Defendants breached the agreement by locking Plaintiff
15 out of the business, refusing to give him access to either
16 corporate or financial information, refused to distribute
17 profits and wrongfully terminated his employment.

18   86.  As a proximate result of the foregoing, Plaintiff has
19 been damaged in an amount to be shown at trial.

20   WHEREFORE, plaintiff prays for relief as set forth
21 hereinafter.

22                     **FOURTH CAUSE OF ACTION**

23  **(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

24   87.  Plaintiff repleads, repeats verbatim, and incorporates
25 each and every allegation appearing at Paragraphs 1-73 of this

17

Complaint, as though fully stated herein, and complains of each named defendant and does one through twenty as follows:

88.   Implied in the agreement between named defendants and Mr. Nguyen is and was a covenant of good faith and fair dealing prohibiting each party from doing anything that would deprive the other party of the expected benefits of the agreement.

89.   Defendants, and each of them, breached, and continue to breach, the implied covenant of good faith and fair dealing by deceiving Plaintiff and refusing to honor his rights as a shareholder, all as set forth above.

90.   As a direct and proximate result of defendants' breach of the implied covenant of good faith and fair dealing, Plaintiff has been damaged in an amount to be shown at trial and according to proof plus accruing interest at the legal rate.

WHEREFORE, plaintiff prays for relief as set forth hereinafter.

## FIFTH CAUSE OF ACTION

### (FRAUD)

91.   Plaintiff repleads, repeats verbatim, and incorporates each and every allegation appearing at Paragraphs 1-73 of this Complaint, as though fully stated herein, and complains of each named defendant and does one through twenty as follows:

92.   Defendants made the representations set forth above in order to induce Mr. Nguyen to continue to perform services for MCC and represent the same to Franchisor, so as to induce

Franchisor to enter into the Franchise Agreement.  Defendants knew they would not honor the promises and representations made to Mr. Nguyen at the time they were made.  Defendants did in fact refuse to respect Mr. Nguyen's rights as a shareholder of MCC with the intent of separating Mr. Nguyen from his shares without his consent or adequate consideration.

93.  Mr. Nguyen, at the time these representations were made by defendants and at the time Plaintiff took the actions herein alleged, was ignorant of the falsity of defendants' representations and believed them to be true. In reliance on these representations, Mr. Nguyen was induced to enter into the agreement and provide the services referenced herein. Had Mr. Nguyen known the actual facts, Mr. Nguyen would not have entered into the agreement with defendants nor would he have provided the services rendered.

94.  As a proximate result of defendants' fraud and deceit and the facts herein alleged, Mr. Nguyen has sustained damages in an amount to be shown at trial and according to proof.

95.  By reason of defendants' fraud as herein alleged, Mr. Nguyen has suffered and continues to suffer damages, as well as attorneys' fees and costs for this action, all in amounts to be shown at trial.

## SIXTH CAUSE OF ACTION

### (Accounting)

96.   Plaintiff repleads, repeats verbatim, and incorporates each and every allegation appearing at Paragraphs 1-73 of this Complaint, as though fully stated herein, and complains of each named defendant and does one through twenty as follows:

97.   As a twenty percent (20%) shareholder of MCC, Plaintiff is entitled to full access to the financial records and other corporate records of MCC. Since on or about July 9, 2013, and continuing to the present time, Defendant Chow has taken control of the financial records and other corporate records of MCC and refuses to permit Plaintiff's inspection of same, in violation of California Corporations Code and her duties as an officer, director and majority shareholder of MCC.  Defendants' obligations under the California Corporations Code included the duty to protect the interests of Plaintiff, to provide full access to financial records and to properly account for and properly payout all profits. In the course of the management of MCC, Defendant Chow has collected various monies and incurred various expenses. A portion of the profits, bonuses, payments and other monies are due to Plaintiff. Moreover, Defendant has misappropriated assets of MCC to her own benefit.  The exact amount is unknown to Plaintiff and cannot be ascertained without an accounting of MCC.  Therefore, a judicially-ordered accounting is necessary.

98.   Plaintiff has standing to bring this cause of action pursuant to California Corporations Code §800 and based upon the facts alleged hereinabove.

WHEREFORE, Plaintiff prays for entry of judgment as hereinafter set forth.

**SEVENTH CAUSE OF ACTION**

**(Judicial Dissolution of Corporation)**

99.   Plaintiff repleads, repeats verbatim, and incorporates each and every allegation appearing at Paragraphs 1-73 of this Complaint, as though fully stated herein, and complains of MCC as follows:

100. Defendant MCC is a corporation organized and existing under the laws of the State of California, and has its principal office located in County of San Mateo, California.

101. MCC is not subject to the Banking Law, Public Utilities Law, Savings and Loan Association Act, or Sections 1010-1062 of the Insurance Code.

102. Plaintiff is the owner of twenty percent (20%) of the number of outstanding shares of MCC exclusive of the number shares owned by Defendant Chow who, as alleged herein, personally participated in the transactions complained of herein.

103. There is internal dissension and two or more factions of shareholders in MCC are so deadlocked that its business can no longer be conducted with advantage to its shareholders.

- COMPLAINT -

104. Plaintiff requests that this Court enter an order dissolving MCC.

WHEREFORE, Plaintiff prays for entry of judgment as hereinafter set forth.

## EIGHTH CAUSE OF ACTION

### (For Unjust Enrichment)

105. Plaintiff repleads, repeats verbatim, and incorporates each and every allegation appearing at Paragraphs 1-73 of this Complaint, as though fully stated herein, and complains of each named defendant and does one through twenty as follows:

106. Defendants were unjustly enriched through the success of MCC, which, in turn, was in large part due to Plaintiff's services.

107. Defendants have failed to compensate Plaintiff for his services or rights as a shareholder of MCC, including profit distributions.

108.   As a direct and proximate result of defendants' unjust enrichment, Plaintiff was damaged in an amount to be shown at trial.

## NINTH CAUSE OF ACTION

### (Common Counts)

109. Plaintiff repleads, repeats verbatim, and incorporates each and every allegation appearing at Paragraphs 1-73 of this Complaint, as though fully stated herein, and complains of each named defendant and does one through twenty as follows:

110. Plaintiff alleges that defendants became indebted to Plaintiff within the last two years for work, labor, services, and profits for which Defendants promised to pay Plaintiff.

111. As a proximate and legal result of the acts and omissions of Defendants, Plaintiff has suffered harm, lost employment, and lost income, benefits and profits, all in an amount to be proven at the time of trial.

112. Plaintiff claims this amount of damages together with interest pursuant to Civ. Cod., §§ 3287, 3291, and/or any other provisions of law providing for prejudgment and post-judgment interest.

### TENTH CAUSE OF ACTION

#### (Quantuim Meruit)

113. Plaintiff repleads, repeats verbatim, and incorporates each and every allegation appearing at Paragraphs 1-73 of this Complaint, as though fully stated herein, and complains of each named defendant and does one through twenty as follows:

114. At all times herein mentioned, Plaintiff reasonably expected to be compensated for the above-described work, labor, and services to MCC and receive profits for his twenty percent (20%) interest in the same.

WHEREFORE, Plaintiff prays for entry of judgment as hereinafter set forth.

### ELEVENTH CAUSE OF ACTION

#### (Wrongful Termination)

115. Plaintiff repleads, repeats verbatim, and incorporates each and every allegation appearing at Paragraphs 1-73 of this Complaint, as though fully stated herein, and complains of each named defendant and does one through twenty as follows:

116. Defendants contracted with Plaintiff to hire him and have him operate the franchise in consideration for Plaintiff agreeing to act as manager.  When Plaintiff refused to be sell his twenty percent (20%) stake in MCC for a value far less than the fair value, Defendants retaliated against him by locking him out of the business, constructively terminating him, and ceasing to provide his wages.

117. As a proximate and legal result of the acts and omissions of Defendants, Plaintiff has suffered harm and lost employment, all in an amount to be proven at the time of trial.

61.  Plaintiff further alleges that Defendants act were wanton and done with malice.

### TWELFTH CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress)

118. Plaintiff repleads, repeats verbatim, and incorporates each and every allegation appearing at Paragraphs 1-73 of this Complaint, as though fully stated herein, and complains of each named defendant and does one through twenty as follows:

119. In having Mr. Loi intimidate and threaten Mr. Nguyen, Defendant Chow acted intentionally or recklessly.

120. Defendant Chow's conduct was extreme and outrageous.

121. Defendant Chow's acts have caused Mr. Nguyen extreme distress.

122. Mr. Nguyen suffers severe emotional distress as a result of Defendant Chow's conduct.

### THIRTEENTH CAUSE OF ACTION

### (Stalking (Civ. Code §1708.7))

123. Plaintiff repleads, repeats verbatim, and incorporates each and every allegation appearing at Paragraphs 1-73 of this Complaint, as though fully stated herein, and complains of each named defendant and does one through twenty as follows:

124. Defendant Chow, through the acts of Mr. Loi, engaged in a pattern of conduct the intent of which was to follow, alarm, or harass Mr. Nguyen.

125. As a result of this pattern of conduct, Mr. Nguyen reasonably feared for his safety.

126. Defendant Chow, through the acts of Mr. Loi, as a part of the pattern of conduct set forth above, made a credible threat with the intent to place Mr. Nguyen in reasonable fear for his safety.  On at least one occasion, Mr. Nguyen clearly and definitively demanded that the Defendant Chow and Mr. Loi cease and abate this pattern of conduct, but Mr. Loi, on behalf of Defendant Chow, persisted in this pattern of conduct.

### THIRTEENTH CAUSE OF ACTION

### Civil Violation Of Rico (18 U.S.C. 1962 (a)-(d))

127. Plaintiff repleads, repeats verbatim, and incorporates each and every allegation appearing at Paragraphs 1-73 of this Complaint, as though fully stated herein, and complains of each named defendant and does one through twenty as follows:

128. All Defendants formed an "enterprise," as defined in 18 V.S.C. §1961(4), for committing the torts and crimes set forth above.  MCC was also an "enterprise" as defined in 18 U.S.C. §1961(4).  MCC affected interstate commerce, and engaged in interstate commerce.  Defendant Chow directly, and through Defendant Loi, her co-conspirator, threatened Mr. Nguyen with physical violence in order to obtain full control of MCC and lock him out of the Franchise. These acts constitute "extortion" within the meaning of 18 U.S.C. §1951 (b)(2), as well as California Penal Code §§518-523.  Defendant Loi theft of the check or checks, as set forth above, constitutes an act of bank fraud within the meaning of 18 U.S.C. §1344.

129. Defendants Chow and Loi are each "person[s]" as defined in 18 U.S.C. §1961(3), as individuals capable of holding a legal or beneficial interest in property. Defendant Chow, with Defendant Loi as her co-conspirator, used MCC to generate personal income, through embezzlement, among other torts, in a pattern of racketeering activity detailed hereinabove.  All the actions by Defendants Chow and Loi constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. §1961 (5).

130. Defendant Chow, with Defendant Loi as her co-conspirator, acquired and maintained control of MCC through the pattern of racketeering activity detailed above. All Defendants to this action conspired to commit, continue, or conceal the aforementioned acts, in violation of the RICO Act, 18 U.S.C. §1962.

131. The aforementioned actions of Defendants directly and proximately caused damage to Plaintiff including lost profits, lost business opportunities, and lost wages, in an amount to be shown at trial.

**Wherefore, plaintiff prays judgment as follows:**

On the First, Second, Fifth, Twelfth and Thirteenth Causes of Action plaintiff prays for judgment against the defendants, and each of them, jointly and severally as follows:

a.   Damages in an amount to be shown at trial, plus pre-judgment interest at the annual rate of 10%, according to proof;

b.   All costs of suit; and such other relief as the Court deems just, including reasonably attorneys' fees and costs for the Second Cause of Action for Conversion, pursuant to Civil Code § 3336; and

c.   In addition to actual damages, exemplary damages as defined in Civil Code § 3294, to make an example of and to punish defendants.

On the Third and Fourth Causes of Action plaintiff prays for judgment against the defendants, and each of them, jointly and severally as follows:

    a.   Compensatory damages (contract, extra-contract and/or general) in an amount to be shown at trial plus interest to the present, according to proof; and

    b.   All costs of suit; and such other relief as the Court deems just and proper.

On the Sixth and Seventh Causes of Action plaintiff prays for judgment against the defendants, and each of them, jointly and severally, for all costs of suit and such other relief as the Court deems just, including reasonably attorneys' fees and costs pursuant to Corporations Code §1604 (*Valtz v. Penta Inv. Corp.* (1983) 139 CA3d 803, 811, 188 CR 922);

On the Eighth, Ninth and Tenth Causes of Action plaintiff prays for judgment against the defendants, and each of them, jointly and severally as follows:

    a.   Damages in an amount to be shown at trial, plus pre-judgment interest at the annual rate of 10%, according to proof; and

    b.   All costs of suit; and such other relief as the Court deems just, including reasonably attorneys' fees and costs.

1       On the Eleventh Cause of Action for Wrongful

2 Termination plaintiff prays for judgment against the defendants,

3 and each of them, jointly and severally as follows:

4       a. Compensatory damages for lost wages in an amount

5 to be shown at trial, plus pre-judgment interest at the annual

6 rate of 10%, according to proof;

7       b. All costs of suit; and such other relief as the

8 Court deems just, including reasonably attorneys' fees and costs

9 for the Second Cause of Action for Conversion, pursuant to the

10 California Labor Code, including, but not limited to penalties;

11 and

12       c. In addition to actual damages, exemplary damages

13 as defined in Civil Code § 3294, to make an example of and to

14 punish defendants.

15    On the Fourteenth Cause of Action Plaintiff prays for

16 judgment against the defendants, and each of them, jointly and

17 severally as follows:

18       a. Damages in an amount to be shown at trial, plus

19 pre-judgment interest at the annual rate of 10%, according to

20 proof; and

21       b. All costs of suit; and such other relief as the

22 Court deems just, including reasonably attorneys' fees and

23 costs.

24

25

1        c.   In addition to actual damages, exemplary damages

2  as defined in Civil Code § 3294, to make an example of and to

3  punish defendants.

4        D.   Treble damages according to statute.

5

6  Dated:   March 7, 2014

7

8

9

10                                Joshua A. Ridless

                                   Attorney for

11                                Plaintiff,

                               Dan Nguyen

12

13

14

15

16

17

18

19

20

21

22

23

24

25

- COMPLAINT -

**<u>EXHIBIT A</u>**
MCC Corporate Documents

- COMPLAINT -

| **ARTS-GS** | **Articles of Incorporation of a General Stock Corporation** |
| --- | --- |

**3483115**

To form a **general stock corporation** in California, you can fill out this form or prepare your own document, and submit for filing along with:

- A **$100** filing fee,

- A separate, non-refundable **$15** service fee, if you drop off the completed form or document.

*Important!* Corporations in California may have to pay a minimum $800 yearly tax to the California Franchise Tax Board. Go to www.ftb.ca.gov for more information.

Note: *Before submitting the completed form*, you should consult with a private attorney for advice about your specific business needs.

**FILED**
In the Office of the Secretary of State
of the State of California

**JUN 1 1 2012**

This Space For Office Use Only

For questions about this form, go to *www.sos.ca.gov/business/be/filing-tips.htm.*

**Corporate Name**  (List the proposed corporate name.  Go to www.sos.ca.gov/business/be/name-availability.htm for general corporate name requirements and restrictions.)

① The name of the corporation is  MCC Investments, Inc.

**Corporate Purpose**

② The purpose of the corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of California other than the banking business, the trust company business or the practice of a profession permitted to be incorporated by the California Corporations Code.

**Service of Process**  (List a California resident or an active 1505 corporation in California that agrees to be your initial agent to accept service of process in case your corporation is sued.  You may list any adult who lives in California.  You may **not** list your own corporation as the agent. **Do not** list an address if the agent is a 1505 corporation.)

③ a. Agent's name:  Linda D. Lowe, CPA

   b. Agent's address:  724 B Linden Ave.        Burlingame              CA  94010
   
   *Street Address (if agent is **not** a corporation)     City (no abbreviations)     State   Zip*

**Shares**  (List the number of shares the corporation is authorized to issue.  Note:  Before shares of stock are sold or issued, the corporation must comply with the Corporate Securities Law of 1968 administered by the California Department of Corporations.  For more information, go to www.corp.ca.gov or call the California Department of Corporations at (213) 576-7500.)

④ This corporation is authorized to issue only one class of shares of stock.

   The total number of shares which this corporation is authorized to issue is _____ 1000000

This form must be signed by each incorporator.  If you need more space, attach extra pages that are 1-sided and on standard letter-sized paper (8 1/2" x 11").  All attachments are made part of these articles of incorporation.

*Incorporator - Sign here*

Linda D. Lowe, CPA
*Print your name here*

| Make check/money order payable to: **Secretary of State** | **By Mail** | **Drop-Off** |
| --- | --- | --- |
| We can give you up to 2 free certified copies of your filed form if you submit up to 2 completed copies of this form (with all attachments). | Secretary of State Business Entities, P.O. Box 944260 Sacramento, CA 94244-2600 | Secretary of State 1500 11th Street, 3rd Floor Sacramento, CA 95814 |

Corporations Code §§ 200-202 et seq., Revenue and Taxation Code § 23153
ARTS-GS (EST 06/2011)

2011 California Secretary of State
www.sos.ca.gov/business

I hereby certify that the foregoing transcript of _____/_____ page(s) is a full, true and correct copy of the original record in the custody of the California Secretary of State's office.

FEB 1 2 2014

Date:_____

*Debra Bowen*

DEBRA BOWEN, Secretary of State



# State of California
## Secretary of State

**Statement of Information**
(Domestic Stock and Agricultural Cooperative Corporations)

**FEES (Filing and Disclosure): $25.00. If amendment, see instructions.**
**IMPORTANT - READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

| S |
|---|

**E-M69080**

**FILED**
In the office of the Secretary of State of the State of California

**Jul - 5 2012**

This Space For Filing Use Only

---

**1. CORPORATE NAME**

C3483115

MCC INVESTMENTS, INC.

---

**Due Date:**

**Complete Addresses for the Following** (Do not abbreviate the name of the city. Items 2 and 3 cannot be P.O. Boxes.)

| | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 2. STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE | | | |
| 93 SAN JACINTO WAY   SAN FRANCISCO   CA  95127 | | | |
| 3. STREET ADDRESS OF PRINCIPAL BUSINESS OFFICE IN CALIFORNIA, IF ANY | | | |
| 390 EL CAMINO REAL   MILLBRAE  CA 94030 | | | |
| 4. MAILING ADDRESS OF THE CORPORATION, IF DIFFERENT THAN ITEM 2 | | | |

**Names and Complete Addresses of the Following Officers** (The corporation must list these three officers.  A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 5. CHIEF EXECUTIVE OFFICER/ | | | | |
| MARGARET  P  CHOW  93 SAN JACINTO WAY   SAN FRANCISCO CA 95127 | | | | |
| 6. SECRETARY | | | | |
| DAN   29 FUENTE AVENUE   SAN FRANCISCO, CA 94132 | | | | |
| 7. CHIEF FINANCIAL OFFICER/ | | | | |
| MARGARET  P  CHOW  93 SAN JACINTO WAY   SAN FRANCISCO CA 94127 | | | | |

**Names and Complete Addresses of All Directors, Including Directors Who Are Also Officers** (The corporation must have at least one director.  Attach additional pages, if necessary.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 8. NAME | | | | |
| DAN P NGUYEN   29 FUENTE AVENUE   SAN FRANCISCO, CA 94132 | | | | |
| 9. NAME | | | | |
| MARGARET P CHOW   93 SAN JACINTO WAY   SAN FRANCISCO, CA 95127 | | | | |
| 10. NAME | | | | |

**11. NUMBER OF VACANCIES ON THE BOARD OF DIRECTORS, IF ANY:**   0

**Agent for Service of Process** (If the agent is an individual, the agent must reside in California and Item 13 must be completed with a California street address (a P.O.Box address is not acceptable). If the agent is another corporation, the agent must have on file with the California Secretary of State a certificate pursuant to California Corporations Code section 1505 and Item 13 must be left blank.)

| | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 12. NAME OF AGENT FOR SERVICE OF PROCESS | | | |
| DAN D NGUYEN | | | |
| 13. STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, **IF AN INDIVIDUAL** | | | |
| 29 FUENTE AVENUE   SAN FRANCISCO, CA 94132 | | | |

**Type of Business**

**14. DESCRIBE THE TYPE OF BUSINESS OF THE CORPORATION**

AUTOMOTIVE SERVICE

**15.** BY SUBMITTING THIS STATEMENT OF INFORMATION TO THE CALIFORNIA SECRETARY OF STATE, THE CORPORATION CERTIFIES THE INFORMATION CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT.

| 07/05/2012 | LINDA DIANE LOWE | CPA | |
|---|---|---|---|
| DATE | TYPE OR PRINT NAME OF PERSON COMPLETING THE FORM | TITLE | SIGNATURE |

| SI-200 C (REV 10/2010) | APPROVED BY SECRETARY OF STATE |
|---|---|



# State of California
## Secretary of State

**Statement of Information**
(Domestic Stock and Agricultural Cooperative Corporations)
**FEES (Filing and Disclosure): $25.00.**
**If this is an amendment, see instructions.**
**IMPORTANT - READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

S

**E-T06590**

# FILED

In the office of the Secretary of State of the State of California

**Jun - 27  2013**

This Space For Filing Use Only

1. **CORPORATE NAME**
MCC INVESTMENTS, INC.

390 EL CAMINO REAL
MILLBRAE CA 94030

2. **CALIFORNIA CORPORATE NUMBER**   C3483115

**No Change Statement** ( Not applicable if agent address of record is a P.O. Box address. See instructions.)

3. **If there have been any changes to the information contained in the last Statement of Information filed with the California Secretary of State, or no statement of information has been previously filed, this form must be completed in its entirety.**
☐ If there has been no change in any of the information contained in the last Statement of Information filed with the California Secretary of State, check the box and proceed **to Item 17.**

**Complete Addresses for the Following** (Do not abbreviate the name of the city. Items 4 and 5 cannot be P.O. Boxes.)

| | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 4. STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE<br>390 EL CAMINO REAL   MILLBRAE  CA 94030 | | | |
| 5. STREET ADDRESS OF PRINCIPAL BUSINESS OFFICE IN CALIFORNIA, IF ANY<br>93 SAN JACINTO WAY   SAN FRANCISCO   CA 94127 | | | |
| 6. MAILING ADDRESS OF CORPORATION, IF DIFFERENT THAN ITEM 4 | | | |

**Names and Complete Addresses of the Following Officers** (The corporation must list these three officers.  A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 7. CHIEF EXECUTIVE OFFICER/<br>MARGARET  CHOW CHOW 93 SAN JACINTO WAY   SAN FRANCISO CA 94127 | | | | |
| 8. SECRETARY<br>MARGARET CHOW  CHOW 93 SAN JACINTO WAY   SAN FRANCISO  CA 94127 | | | | |
| 9. CHIEF FINANCIAL OFFICER/<br>MARGARET  CHOW CHOW 93 SAN JACINTO WAY   SAN FRANCISO  CA 94127 | | | | |

**Names and Complete Addresses of All Directors, Including Directors Who Are Also Officers** (The corporation must have at least one director. Attach additional pages, if necessary.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 10. NAME<br>MARGARET CHOW  CHOW 93 SAN JACINTO WAY   SAN FRANCISCO  CA 94127 | | | | |
| 11. NAME | ADDRESS | CITY | STATE | ZIP CODE |
| 12. NAME | ADDRESS | CITY | STATE | ZIP CODE |

13. NUMBER OF VACANCIES ON THE BOARD OF DIRECTORS, IF ANY:          0

**Agent for Service of Process**  If the agent is an individual, the agent must reside in California and Item 15 must be completed with a California street address, a P.O.Box address is not acceptable.  If the agent is another corporation, the agent must have on file with the California Secretary of State a certificate pursuant to California Corporations Code section 1505 and Item 15 must be left blank.

14. NAME OF AGENT FOR SERVICE OF PROCESS
MARGARET CHOW CHOW

| 15. STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, **IF AN INDIVIDUAL** | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 93 SAN JACINTO WAY   SAN FRANCISCO  CA 94127 | | | |

**Type of Business**

16. DESCRIBE THE TYPE OF BUSINESS OF THE CORPORATION
AUTOMOTIVE REPAIR

17. BY SUBMITTING THIS STATEMENT OF INFORMATION TO THE CALIFORNIA SECRETARY OF STATE, THE CORPORATION CERTIFIES THE INFORMATION CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT.

| 06/27/2013 | LINDA DIANE LOWE | CPA | |
|---|---|---|---|
| DATE | TYPE/PRINT NAME OF PERSON COMPLETING FORM | TITLE | SIGNATURE |

SI-200 (REV 01/2012)                                                                                    APPROVED BY SECRETARY OF STATE



I hereby certify that the foregoing
transcript of _____ page(s)
is a full, true and correct copy of the
original record in the custody of the
California Secretary of State's office.

FEB 1 2 2014

Date:_____

*Debra Bowen*

DEBRA BOWEN, Secretary of State

**EXHIBIT B**
Franchise Agreement

32

# SPEEDEE WORLDWIDE CORPORATION

## (SINGLE UNIT)

## FRANCHISE AGREEMENT



# SPEEDEE OIL CHANGE & TUNE-UP
## FRANCHISE AGREEMENT

### TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | GRANT OF FRANCHISE. | 5 |
| 2. | TERM AND RENEWAL. | 5 |
| 3. | DUTIES OF SPEEDEE. | 7 |
| 4. | FEES. | 8 |
| 5. | DUTIES OF FRANCHISEE. | 10 |
| 6. | PROPRIETARY MARKS. | 17 |
| 7. | CONFIDENTIAL OPERATING MANUAL. | 19 |
| 8. | CONFIDENTIAL INFORMATION. | 19 |
| 9. | NATIONAL AND LOCAL ADVERTISING. | 20 |
| 10. | INSURANCE. | 21 |
| 11. | TRANSFERABILITY OF INTEREST. | 22 |
| 12. | DEFAULT AND TERMINATION. | 26 |
| 13. | OBLIGATIONS UPON TERMINATION. | 28 |
| 14. | COVENANTS. | 31 |
| 15. | CHANGES AND MODIFICATIONS. | 32 |
| 16. | TAXES AND INDEBTEDNESS. | 33 |
| 17. | INDEPENDENT CONTRACTOR AND INDEMNIFICATION. | 33 |
| 18. | APPROVALS AND WAIVERS. | 34 |
| 19. | NOTICE. | 35 |
| 20. | RELEASE OF PRIOR CLAIMS. | 36 |
| 21. | DISCLOSURE STATEMENT AND DISCLAIMER. | 36 |

22. ENTIRE AGREEMENT. .................................................................................................37

23. SEVERABILITY AND CONSTRUCTION. ....................................................................37

24. APPLICABLE LAW; VENUE..........................................................................................38

25. DISPUTE RESOLUTION. ..............................................................................................38

26. ACKNOWLEDGEMENTS...............................................................................................38

EXHIBIT A  -   DESIGNATED TRADE AREA

EXHIBIT B  -   SITE SELECTION ADDENDUM

EXHIBIT C  -   ENTITY FRANCHISE SUPPLEMENT

EXHIBIT D  -   STATEMENT OF PROSPECTIVE FRANCHISEE

## SPEEDEE OIL CHANGE & TUNE-UP
## FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT ("Agreement") is made and entered into as of __Jan 1__ 201**3**, by and between **SPEEDEE WORLDWIDE CORPORATION**, a corporation incorporated under the laws of the State of Delaware and having its corporate offices at 4300 TBC Way, Palm Beach Gardens, Florida 33410 (hereinafter referred to as "SpeeDee"), **MARGARET P. CHOW**, individually, **DAN NGUYEN**, individually, and **MCC INVESTMENTS, INC.**, a California corporation located at 93 San Jacinto Way, San Francisco, California 94030 (individually and collectively hereinafter referred to as "Franchisee"). If there is more than one Franchisee, their obligations hereunder shall be joint and several.

### W I T N E S S E T H :

WHEREAS, SpeeDee, as the result of the expenditure of time, skill, effort and money, has developed a proprietary system (hereinafter "System") relating to the establishment, development and operation of a SpeeDee Oil Change & Tune-Up Car Care Service Center (each hereinafter referred to as a "SpeeDee Shop" or "SpeeDee Franchised Business") which offers oil changes, tune-ups and other related automobile care services to the public;

WHEREAS, the distinguishing characteristics of the System include, without limitation, specially designed improvements, interior and exterior layouts, signs, marketing and advertising materials, programs, procedures and methods, and training and supervision, all of which may be changed, improved, and further developed by SpeeDee from time-to-time;

WHEREAS, SpeeDee identifies the System by means of certain trademarks, logos, emblems, and indicia of origin (hereinafter "Proprietary Marks" or "Marks"), including, but not limited to, the mark "SpeeDee Oil Change & Tune-Up," and such other trade names, service marks, and trademarks as may be designated now or hereafter by SpeeDee, in the Confidential Daily Operations Manual (as defined in Section 3.A.6), or otherwise in writing, for use in connection with the System;

WHEREAS, SpeeDee continues to develop, expand, use, control and add to the Proprietary Marks and System for the benefit of and exclusive use by itself and its franchisees in order to reflect the changing automobile after-market industry and related markets and changing consumer demands and business opportunities; and

WHEREAS, Franchisee desires to enter into the business of operating a retail automobile care services shop in accordance with the System, and wishes to obtain a franchise from SpeeDee for that purpose, as well as to receive the training and other assistance provided by SpeeDee in connection therewith and has adequate capital and organizational facilities to perform the obligations set forth hereunder.

NOW, THEREFORE, the parties, in consideration of the foregoing premises and the undertakings and commitments of each party to the other party set forth herein, hereby mutually agree as follows:

1.    **GRANT OF FRANCHISE.**

      **A.**    **Franchise.**  SpeeDee hereby grants to Franchisee, upon the terms and conditions herein contained, the nonexclusive right and license, and Franchisee undertakes the obligation, to operate a SpeeDee Shop in strict conformance with SpeeDee's quality control standards and specifications that are a material part of the System, as it may be changed, improved and further developed from time-to-time, only at the approved location specified in Section 1.B and more particularly described in Exhibit A and/or Exhibit B, each of which are attached hereto.  The SpeeDee Shop located at the specific address identified in Section 1.B and more particularly described in Exhibit A and/or Exhibit B is hereinafter referred to as the "Shop" or the "Franchised Business".

      **B.**    **Designated Trade Area.**  The designated trade area of the Shop franchised under this Agreement is **390 El Camino Real, Millbrae, California** (described in Exhibit A).  The trade area shall be a radius of one-half (1/2) mile surrounding the Shop which constitutes Franchisee's targeted market within its boundaries, as determined by SpeeDee (the "Designated Trade Area").  The Franchisee is hereby granted the right to operate one (1) SpeeDee Shop within the Designated Trade Area, at the specific address which is or will be set forth in Exhibit A and/or Exhibit B (hereinafter the "Approved Location").  If, at the time of execution of this Agreement, an Approved Location has not been secured by Franchisee and approved by SpeeDee, Franchisee shall select and present a site and all information and materials relating thereto for SpeeDee's approval, within one hundred eighty (180) days after execution of this Agreement.  In the event Franchisee is required or desires to relocate the Shop from its Approved Location, then, in such event Franchisee shall submit the proposed relocation site to SpeeDee for SpeeDee's approval.  In no event shall such relocation site be located outside the Designated Trade Area or within the Designated Trade Area in a site which, in SpeeDee's opinion, adversely impacts the Designated Trade Area of any other franchisee.  Franchisee shall not relocate the Shop without the prior written approval of SpeeDee.

      **C.**    **Franchisee's Rights in Trade Area.**  During the term of this Agreement and any renewal thereof, SpeeDee shall not establish, nor license another to establish, a SpeeDee Shop using the Marks and System within a one-half (1/2) mile radius of Franchisee's specific Approved Location, without Franchisee's prior written consent.  No other form of exclusivity in the Trade Area is granted and none shall exist or be implied from this Agreement or from any other conduct or course of dealing.

      **D.**    **SpeeDee's Reserved Rights.**  SpeeDee reserves to itself and its affiliates all rights not expressly granted to Franchisee in Section 1.C, including: (1) the right to construct, develop, own, acquire, operate and franchise any type of business, including a competitive business, that does not use the Marks at any location including within the Designated Trade Area; (2) the right to establish, own, operate or franchise others to establish, own and operate SpeeDee Shops using the Marks and System at any locations outside of the Designated Trade Area regardless of proximity to the Designated Trade Area; (3) the right to acquire any business of any kind, whether located within or outside the Designated Trade Area, to merge with another business or to sell its assets to another business, including a competitor.

2.    **TERM AND RENEWAL.**

      **A.**    **Term.**  The initial term of this Agreement shall be fifteen (15) years from the date of its execution.

**B.     Options and Conditions to Renew.** Franchisee shall have the option of renewing its rights and obligations under this Agreement for two (2) additional periods of five (5) years each, subject to the following conditions which must be met prior to renewal, unless to the extent otherwise waived by SpeeDee:

1.     Franchisee shall not be in default of any provisions of this Agreement, any amendment hereof or successor thereto, or any other agreement between Franchisee and SpeeDee, or its subsidiaries and affiliates, and shall have substantially complied with all the terms and conditions of such agreements during the terms thereof;

2.     Franchisee shall deliver to SpeeDee written notice of its intention to renew not more than one hundred eighty (180) days and not less than ninety (90) days prior to the expiration of any initial or renewal term;

3.     Franchisee shall execute the then-current form of franchise agreement which agreement shall supersede in all respects this Agreement and the terms of which may differ from the terms of this Agreement, including, without limitation, different economic or other terms. At this time Franchisee shall also execute a general and unlimited release of all known and unknown claims of Franchisee and indemnity in favor of SpeeDee; provided, however, that in lieu of the then-current initial franchise fee or its equivalency for such renewal period, Franchisee shall be required to pay a renewal fee of the greater of ten percent (10%) of the then-current initial franchise fee paid by new franchisees or $5,000;

4.     Franchisee shall remodel and modernize the Shop, including, without limitation, new interior and exterior design, signs, equipment and decor to conform with the standards and specifications as contained in the then-current Manual;

5.     Franchisee shall have satisfied all monetary obligations owed by Franchisee to SpeeDee and its subsidiaries and affiliates and shall have timely met those obligations throughout the term of this Agreement;

6.     Franchisee shall comply with SpeeDee's then-current qualification and training requirements;

7.     Franchisee, its shareholders, directors and officers shall execute a general release, in a form prescribed by SpeeDee, of any and all claims against SpeeDee and its subsidiaries and affiliates, and their respective officers, directors, agents, and employees; and

8.     Franchisee shall present evidence satisfactory to SpeeDee that it has the right to remain in possession of the premises where the Shop is located for the duration of the renewal term and shall execute the applicable and then-current Real Estate Option, as hereinafter defined.

**C.     Obligation of SpeeDee.** In the event that any of the conditions to renewal set forth in this Agreement and/or in the Manual have not been met, SpeeDee shall have no obligation to renew this Agreement, it being understood that any such renewal right shall be deemed to have been waived by Franchisee, void, and of no force and effect.

**D.     Operations Beyond Term.** If Franchisee continues to operate as a Franchisee after the term of this Agreement without exercising its option to renew, Franchisee shall be deemed to be operating on a month-to-month basis (terminable by either party on thirty (30) days notice) and will be bound by the terms and conditions of this Agreement.

390 El Camino Real, Millbrae, CA/17-021          6
FA – Spring 2012

### 3.  DUTIES OF SPEEDEE.

**A.**  **Initial Obligations**.  Prior to and through the date of the opening of the Shop (the "Opening"), SpeeDee shall provide the services listed below:

1.  Site Selection Assistance.  SpeeDee shall provide general site selection guidelines and consultation.

2.  Design and Construction of the Shop.  SpeeDee shall make available to Franchisee, standard floor plans, construction plans for the interior and exterior design, and the layout of signage and equipment for the Shop.

3.  Opening Advertising Assistance.  SpeeDee shall furnish such general advertising materials, ideas and suggestions for the grand opening advertising promotion (described in Section 4.A.3) as it deems appropriate.

4.  Shop Operations Training.  SpeeDee shall provide Shop operations training (the "Operations Training") as specified in the Manual, which shall be conducted at a SpeeDee Oil Change & Tune-Up Shop and in the regional training center or other corporate office, as designated by SpeeDee.  The training must be completed by Franchisee and/or Franchisee's operating partner ("Operating Partner") who is a co-franchisee and owns at least ten percent (10%) of the corporation and additionally one (1) on-site Shop manager.  If a replacement is required for the on-site Shop manager, such person shall attend and complete, to SpeeDee's satisfaction, Operations Training prior to assumption of the Shop manager's responsibilities.  For new SpeeDee Shops, the Operations Training must be completed, to SpeeDee's satisfaction, at least thirty (30) days prior to the opening of the Shop.  SpeeDee shall be responsible for tuition and materials only.  Franchisee and its employee shall be responsible for all meals, travel, lodging and other expenses incurred in attending SpeeDee's training program.  If the approved manager for the Shop is not trained simultaneously with Franchisee or if a replacement is required for the Shop manager, SpeeDee may charge a training fee for such individual, which shall not exceed One Thousand Five Hundred Dollars ($1,500).

5.  Approved Training Facility.  After the Shop has been open for six (6) months, Franchisee can request that the Shop be approved as a training facility.  In order to be approved, Franchisee and its, his or her Shop manager and the Shop facility must meet the specific standards of SpeeDee and SpeeDee's approval must be in writing.  At any time the Shop drops below the standards, the approval as a training facility can be revoked by SpeeDee.

6.  Confidential Daily Operations Manual.  SpeeDee shall provide Franchisee one (1) copy of the SpeeDee Oil Change & Tune Up Daily Operations Manual, which shall include a Shop Operations Manual and a Marketing and Advertising Manual (collectively, the "Manual"), subject to the conditions described in Article 7.  SpeeDee may, from time-to-time and in its sole discretion, revise, supplement or modify the Manual by issuing supplemental bulletins, notices, revisions, modifications or amendments thereto, and other written (including electronic) directives.  These revisions, modifications or amendments, as issued from time-to-time by SpeeDee, shall become a part of the Manual.

**B.**  **Continuing Obligations**.  SpeeDee shall provide the services listed below subsequent to the opening of the Shop throughout the term of this Agreement:

1.      Inspections and Evaluations of the Shop. SpeeDee shall continue its efforts to maintain high standards of quality, appearance, professionalism, and service in connection with the System, in both SpeeDee's conduct and in the conduct of all franchisees, and to that end SpeeDee and/or its representative has the right to conduct, as it deems advisable, inspections and evaluations of the Shop. Such visits may be announced or unannounced.

2.      On-going Training. SpeeDee may, at its sole discretion, conduct periodic training programs for its network of franchisees and its approved shop manager to reflect further developments and changes in procedures, methods and operations. SpeeDee shall be responsible for tuition and materials for all mandatory training and may also offer additional training for which Franchisee shall be responsible for all related expenses.

4.      **FEES.**

A.      Initial and Ongoing Fees. In consideration of the right and license to operate the Franchised Business as granted herein, Franchisee shall pay to SpeeDee the following fees, all in U.S. dollars:

1.      Initial Franchise Fee. Franchisee shall pay an initial franchise fee to SpeeDee of Thirty Thousand Dollars ($30,000) for Franchisee's first franchise. The initial franchise fee shall be payable in full upon execution of this Agreement. The initial franchise fee shall be deemed fully earned by SpeeDee upon payment thereof and is non-refundable, except as otherwise provided herein. For the second franchise unit, the initial franchise fee is $25,000, provided the first unit is open and operating, and for the third and all subsequent units, the initial franchise fee is $20,000, provided at least two other franchise units are open and operating. Purchases of additional franchises shall require the execution of another franchise agreement on the form then being used by SpeeDee, which may be materially different from this Agreement in its terms and conditions. Nothing in the foregoing provisions shall obligate SpeeDee to offer or sell additional franchises to Franchisee.

2.      Royalty Fees. (a) Except as otherwise set forth in Section 4.A.2(b) and Section 4.A.2(c), Franchisee shall pay to SpeeDee a continuing, nonrefundable weekly royalty fee in an amount equal to six percent (6%) of Gross Sales, as defined herein.

(b)      Franchisee shall also pay to SpeeDee, at the same time the royalty fees provided for in Section 4.A.2(a) are payable, a reduced royalty in an amount equal to five percent (5%) of Gross Sales from the sale of Brake Products and Services only. "Brake Products and Services" shall mean, and shall be limited solely to, brake products and brake repair services which are provided at or in connection with the Shop. Brake Products and Services shall not include brake flush services.

(c)      The royalty fees provided for in Section 4.A.2(a) and Section 4.A.2(b) shall hereinafter collectively be referred to as the "Royalty Fees". The minimum Royalty Fees to be paid by Franchisee to SpeeDee hereunder shall be Two Hundred Twenty Five Dollars ($225). The Royalty Fees received by SpeeDee shall not be deemed trust funds nor shall SpeeDee be required to segregate such funds in any way, but they shall be deemed general funds of SpeeDee for all purposes. Payment of Royalty Fees shall be made by electronic payment transactions through automated clearing house debits ("ACH Debit") in accordance with Section 4.B.

3.      Grand Opening Advertising Promotion. Franchisee must arrange a grand opening promotion that will run during the period from fifteen (15) days before to thirty (30) days after the opening of the Shop, which may include a direct mail campaign, a public relations program, distribution of advertising novelties,

specialty items, food and drinks, media advertising and related campaigns. Franchisee shall spend at least Five Thousand Dollars ($5,000) and generally not greater than Ten Thousand Dollars ($10,000) on the grand opening promotion. Franchisee must finish spending this amount, in full, no later than one hundred eighty (180) days after the opening of the Shop for business. Franchisee will pay the grand opening fee to SpeeDee, in advance, and SpeeDee will reimburse Franchisee up to this amount when it supplies receipts for the grand opening promotion. Proof of such expenditures (in the form of cancelled checks, paid invoices, copies of advertisements or otherwise) shall be submitted to SpeeDee within sixty (60) days following each related expense.

4.      Marketing Fees. Franchisee shall pay to SpeeDee six percent (6%) of Gross Sales or Two Hundred Twenty Five Dollars ($225), whichever is greater, as a continuing nonrefundable weekly marketing fee (the "Marketing Fee"). Franchisee shall pay the Marketing Fee for the preceding week via ACH Debit. SpeeDee has the sole discretion, which is hereby acknowledged by Franchisee, to determine how the Marketing Fee(s) will be spent, and does not guarantee that all contributions will be spent in the geographic area within which the Shop is located or that the advertising will increase sales or Franchisee's profitability. Marketing Fees are not refundable upon termination, expiration, transfer or nonrenewal of the franchise or for any other reason.

B.      **Payment Procedures**. In order to facilitate Franchisee's payment by ACH Debit, as required herein, Franchisee shall execute Franchisor's then-current form of Authorization Agreement For Direct Payments (the "ACH Agreement"), concurrently with its, his and/or her execution of this Agreement and at any time during the term of this Agreement, upon SpeeDee's request. For payment purposes, each week shall begin on Sunday and end on Saturday. ACH Debit payments are due on Wednesday of each week for the preceding business week. In the event that any payments are due on a national holiday, payment shall be due on the first business day following such holiday. A late payment fee of One Hundred Dollars ($100) shall be assessed for each week that said weekly fee is delinquent. A non-sufficient fund fee of One Hundred Dollars ($100) shall be assessed for any uncollected ACH Debit which may result from insufficient or uncollected funds. If any payment is overdue, Franchisee shall pay to SpeeDee, in addition to the late payment fee and the overdue amount, interest on such amount from the date it was due until paid at twice the prime rate being charged by the JP Morgan Chase Bank or its successor on the date payment was due or the maximum rate permitted by state law, whichever is less. Such interest, which shall be calculated on a daily basis, shall be in addition to any other remedies SpeeDee may have.

C.      **Definition of Gross Sales**. "Gross Sales", as used herein, is defined as all sales of merchandise or products of any kind, all charges for service, installation or labor done in, on and from the Franchised Business, and income of every kind or nature related to the Franchised Business, including, without limitation, sales for cash, credit or barter (and regardless of collectability), but exclusive of all sales taxes, use taxes, gross receipts taxes and other similar taxes added to the sales price and collected from the customer, and less any bona fide refunds, rebates and discounts.

D.      **Reports and Records**. Franchisee shall electronically submit to SpeeDee on a weekly basis by 9:00 a.m. Central Standard Time on Tuesday of each week for the preceding calendar week (Sunday through Saturday) and pursuant to the processes described herein and in the Manual, a true, correct and complete statement of Gross Sales in a format provided or prescribed by Franchisor. If the term of this Agreement commences or ends on a day other than the first or last day of a calendar week, respectively, the Royalty Fees and the Marketing Fees for such week shall be based upon the Gross Sales for the portion of the week commencing or ending with the date of commencement or termination of the term of this Agreement, as the case may be.

5.     **DUTIES OF FRANCHISEE.**

A.     **Initial Construction and Opening Schedule.**

1.     Site Selection. If, at the time of execution of this Agreement, an Approved Location has not been secured by Franchisee and approved by SpeeDee, Franchisee shall initiate a diligent and continuous search for such location. Franchisee shall select and present a site and all information and materials relating thereto for SpeeDee's approval which may include, but not be limited to, a completed site evaluation questionnaire, a description of the proposed site, such other information as SpeeDee may reasonably require and a letter of intent or other evidence satisfactory to SpeeDee which confirms Franchisee's favorable prospects for obtaining the proposed site, within one hundred eighty (180) days of the execution of this Agreement, such site to be located within the Designated Trade Area. SpeeDee shall have thirty (30) days after receipt of such information and materials from Franchisee to approve or disapprove, in SpeeDee's sole discretion, the site as a location for the Shop, the "Approved Location." The proposed site shall be deemed approved by SpeeDee if not disapproved by written notice sent to Franchisee within the thirty (30) day period. Concurrently with SpeeDee's approval of the site, Franchisee and SpeeDee shall execute the Site Selection Addendum, attached hereto as Exhibit B. SITE SELECTION APPROVAL BY SPEEDEE SHALL IN NO WAY BE DEEMED A REPRESENTATION, WARRANTY OR GUARANTY OF THE FINANCIAL SUCCESS OF THE SHOP AT THE APPROVED LOCATION.

2.     Contractor. Franchisee shall employ a qualified licensed general contractor, reasonably acceptable to SpeeDee, to construct the Shop and to complete all improvements in accordance with approved plans. The Franchisee shall employ a qualified architect, engineer or other licensed and professionally quali-fied individual to modify such plans to conform with local legal requirements and specifications. Written approval shall be obtained from SpeeDee for any modifications or deviations from the plans.

3.     Completion of Construction. Franchisee shall complete construction (including all exterior and interior carpentry, electrical, painting, and finishing work, and installation of all furniture, fixtures, equipment, and signs) in accordance with the approved final plans, at Franchisee's expense, within one hundred eighty (180) days after final site approval, or sooner if required by Franchisee's lease (exclusive of time lost by reason of strikes, lockouts, fire, other casualties beyond the control of Franchisee and acts of God).

4.     Final Inspection. Franchisee shall not open the Shop for business to the general public until SpeeDee has granted written authorization to open.

5.     Opening. If Franchisee fails to open the Shop within one hundred eighty (180) days after SpeeDee's approval of the site, SpeeDee shall have the right to terminate this Agreement pursuant to Section 12.A.12.

6.     Real Estate Option. Franchisee shall execute a real estate option agreement with SpeeDee or its designee giving SpeeDee or its designee the right to occupy the Shop's premises in the event of termination or expiration of this Agreement (or in the event Franchisee defaults or fails to exercise a renewal option under its lease) in order to assure that the site may continue to be operated as a SpeeDee Shop, if SpeeDee or its designee so chooses. If Franchisee (directly or indirectly, in whole or in part) owns the real estate upon which the Shop is located, Franchisee will be required to execute the then-current version of "Option and Shop Lease". The Option and Shop Lease permits SpeeDee or its designee to lease the Shop's premises in the event this Agreement is terminated or expires and SpeeDee or its designee chooses to exercise its option. If

Franchisee leases the real estate upon which the Shop is located from a third party, Franchisee shall execute the then-current version of "Option for Assignment of Lease" which gives SpeeDee or its designee the right, but not the obligation, to lease the premises in the event this Agreement is terminated or expires or if Franchisee is in default under the lease or fails to exercise a renewal option under the lease. Franchisee shall provide documentation to SpeeDee, upon request, establishing Franchisee's ownership of the real estate or its leasehold interest in the premises, as applicable. Franchisee shall also execute any additional documentation required by SpeeDee or its designee to put the Option and Shop Lease or Option for Assignment of Lease of record and to make such Option and Shop Lease or Option for Assignment of Lease binding on any mortgagee or other lien holder. The Option and Shop Lease, the Option for Assignment of Lease and any such additional documentation required by SpeeDee or its designee are collectively referred to herein as "Real Estate Documents". Franchisee shall sign the applicable Real Estate Documents after SpeeDee has approved a location for the Shop (and depending on the timing of Franchisee's purchase of the real estate or its completion of lease negotiations, as applicable), but in any case Franchisee shall sign and deliver to SpeeDee or its designee the applicable Real Estate Documents prior to construction, occupancy and/or operation of the Shop. If Franchisee fails to execute the applicable Real Estate Documents upon the earlier of: (a) the day prior to the opening of the Shop and (b) the fifteenth (15th) day after written demand from SpeeDee or its designee (which shall not be demanded prior to the Shop location being approved by SpeeDee), then SpeeDee shall have the right to terminate this Agreement pursuant to Section 12.A.15.

        **B.**      **Training**. Franchisee agrees that it is critical to the operation of the System and the business franchised hereunder that the training requirements be completed. Additionally, Franchisee agrees that Franchisee and/or Franchisee's Operating Partner, who is a co-franchisee and owns at least ten percent (10%) of the corporation, and additionally one (1) on-site shop manager (unless Franchisee or the Operating Partner will manage the Shop), shall attend and complete, to SpeeDee's satisfaction, the Operations Training program conducted by SpeeDee. If a replacement is required for the shop manager, he or she shall attend and complete, to SpeeDee's satisfaction, Operations Training prior to assuming shop manager responsibilities.

        **C.**      **Compliance With Policies, Regulations, Procedures and Uniform Standards**. Franchisee shall, at all times, operate the Shop in conformity with all policies, regulations, procedures and uniform methods, standards and specifications as contained in the then-current Manual and as SpeeDee may from time-to-time prescribe to ensure that the highest degree of quality for the products and services offered is uniformly maintained. Franchisee shall conduct its business in a manner which reflects favorably at all times on the System and the Proprietary Marks. Franchisee shall at no time engage in deceptive, misleading or unethical practices or conduct any other act which may have a negative impact on the reputation and goodwill of SpeeDee or any other franchisee operating under the System. Pursuant to this ongoing responsibility and without limiting the generality of the foregoing, Franchisee agrees to:

        1.      Use, at all times, only such methods, standards and specifications contained in the Manual or otherwise provided to Franchisee by SpeeDee and to refrain from deviating therefrom without SpeeDee's prior written consent;

        2.      Sell or offer for sale only such products and services as meet SpeeDee's uniform standards of quality and quantity, as have been expressly approved for sale as prescribed in the Manual or in writing by SpeeDee in accordance with SpeeDee's methods and techniques; to refrain from any deviation from SpeeDee's methods, techniques, standards and specifications; and to discontinue such products or services as SpeeDee may, in its discretion, disapprove in writing at any time;

3.      Purchase and install, at Franchisee's expense, all fixtures, furnishings, signs and equipment as SpeeDee may reasonably specify from time-to-time in the Manual or otherwise in writing; and to refrain from installing or permitting to be installed on or about the Shop, without SpeeDee's prior written consent, any fixtures, furnishings, signs, cards, vending machines, games, promotional literature, equipment or other items not previously specifically approved as meeting SpeeDee's standards and conforming to SpeeDee's specifications;

4.      Employ such minimum number of employees as may be prescribed by the Manual or in writing by SpeeDee and to comply with all applicable federal, state and local laws, rules and regulations with respect to such employees and the operation of the Shop;

5.      Maintain a competent, conscientious staff and to take such steps as are necessary to ensure that its employees keep a neat, clean and professional appearance and comply with such uniform attire, health, safety and hygiene standards as SpeeDee may prescribe in the Manual and from time-to-time;

6.      Ensure that all third parties with whom Franchisee conducts business, are properly insured;

7.      Establish and maintain, at all times, high speed Internet access at the Shop, as well as an electronic mail address dedicated to the business of the Shop;

8.      Utilize and upgrade such computer hardware and software programs, including, but not limited to, point-of-sale software and technical information systems, as may be designated or directed by SpeeDee from time-to-time in its sole and absolute discretion; and

9.      Comply with SpeeDee's real estate policies including, but not limited to, the obligation to execute (and cause the appropriate parties to execute) the Real Estate Documents as shall be applicable from time-to-time during the term of this Agreement.

**D.      Product and Service Assortment**. Franchisee shall offer to customers only the product and service assortment prescribed from time-to-time by SpeeDee in the Manual or previously approved in writing by SpeeDee. In the event that Franchisee desires to sell products or offer services not previously approved by SpeeDee, Franchisee shall request, in writing, SpeeDee's approval, in writing, and shall provide all materials and information relating to the said products to SpeeDee. Such approval shall be obtained in accordance with the specifications as set forth in the Manual. SpeeDee's consent to such request will not be unreasonably withheld or delayed.

**E.      Additional Training**. Franchisee shall cause its employees to attend and complete, to SpeeDee's satisfaction, such additional training programs as SpeeDee may require in writing from time-to-time. SpeeDee shall only provide and pay for instruction and training materials in connection with such mandatory additional training. Franchisee and/or its manager and employees shall be responsible for any and all other expenses incurred in training, including, without limitation, the costs of meals, entertainment, lodging, travel, and wages. SpeeDee may also offer optional additional training for which Franchisee shall be responsible for all related expenses.

**F.      Operation of Facility**. Franchisee shall use the location of the Shop solely for the operation of the business in conformance with the System, shall keep the Shop open and in normal operation for such minimum hours and days as SpeeDee may from time-to-time prescribe in the Manual or otherwise, and shall refrain from using or permitting the use of the premises of the Shop for any other purpose or activity at any time without first obtaining the written consent of SpeeDee.

**G.     Promotion of Products and Services.**  Franchisee shall at all times actively promote the products and services prescribed from time-to-time by SpeeDee to be offered by the Shop, and will use its best efforts to cultivate, develop and expand the market for these products and services at its Approved Location within its Designated Trade Area.

**H.     Use of Standard Forms and Reports.**  Franchisee shall use in the Shop such forms and reports that conform to the standards prescribed by SpeeDee in the Manual or otherwise in writing which shall include chronologically numbered SpeeDee Oil Change & Tune-Up Service Orders.

**I.     Maintenance and Refurbishment.**  Franchisee shall continuously maintain the Shop in the highest degree of sanitation, repair and condition as SpeeDee may reasonably require, and in connection therewith, shall make such additions, alterations, repairs and replacements thereto (but not without SpeeDee's prior written consent) as may be required for that purpose, including, without limitation, such periodic redecorating, remodeling, structural changes, replacement of obsolete equipment, fixtures, materials or products as SpeeDee may reasonably direct.  Architectural refurbishment shall not be required more often than once every four (4) years.

**J.     Compliance with Local and State Regulations.**  Franchisee shall obtain all business licenses, permits and certificates required for lawful construction and ongoing operation of the Shop (including, without limitation, zoning, access, variances [if required], health and safety, sign and fire requirements) and shall certify, in writing, to SpeeDee that all such licenses, permits and certifications have been obtained.

**K.     Working Capital.**  Franchisee shall meet and maintain sufficient levels of working capital for use in connection with the management and operation of the Franchised Business as SpeeDee may reasonably require.

**L.     Product and Supply Standards.**  Franchisee shall purchase products, equipment, supplies, services, and other materials required for the operation of the Shop from SpeeDee or a designated approved supplier who shall have proved, to the continuing reasonable satisfaction of SpeeDee, the ability to meet SpeeDee's reasonable standards and specifications for such products, services and related items.  Franchisee shall strictly comply with the procedures set forth in the Manual to obtain the prior approval of SpeeDee of a proposed vendor or supplier that is not on the list of approved suppliers.

**M.     Inspections.**  Franchisee shall permit SpeeDee or its agents or representatives to enter upon the premises of the Shop at any reasonable time for purposes of determining compliance with the standards, specifications, requirements and procedures contained in this Agreement and in the Manual and for any other related purpose; shall cooperate fully with SpeeDee's agents or representatives in such inspections by rendering such assistance as they may reasonably request; and, upon notice from SpeeDee or its agents or representatives, and without limiting SpeeDee's other rights under this Agreement, take such steps as may be necessary to immediately and diligently correct any deficiencies detected during such inspections, including, without limitation, immediately desisting from the further use of any methods, equipment, advertising materials, programs, supplies, products, services or other items that do not conform to SpeeDee's then-current specifications, standards or requirements.  In the event Franchisee fails or refuses to correct such deficiencies, SpeeDee shall have the right to enter upon the premises of the Shop, without being guilty of trespass or any other tort, for the purpose of making or causing to be made such corrections as may be required, at the expense of Franchisee, which expense Franchisee agrees to pay upon demand.

**N.**    **Modifications to System**.  Franchisee acknowledges and agrees that SpeeDee has developed and shall continue to develop new methods and improve existing methods, services, programs, operational systems, management techniques and products and may continue to develop additional products, services, and proprietary methods and techniques for use in the operation of the Shop which are all highly confidential and which are trade secrets of SpeeDee.  Because of the importance of quality control and uniformity of products and services and the significance of such proprietary methods in the System, it is to the mutual benefit of the parties that SpeeDee closely controls the dissemination of this proprietary information.  Accordingly, Franchisee agrees that, in the event such information and techniques become a part of the System, Franchisee shall comply and strictly follow these techniques in the operation of its business and shall purchase from SpeeDee or from an approved source designated by SpeeDee any products, supplies, services or materials necessary to protect and implement such techniques.

**O.**    **Disclosure**.  Franchisee shall not disclose the names of other franchisees to any other person(s), or directly or indirectly solicit any other franchisee or owner for any business or investment activity of any type or description or for any other purpose.

**P.**    **Maintenance of Books and Records**.  Franchisee agrees to maintain, during the term of this Agreement, complete and accurate books, records and accounts including records of all Gross Sales, in the manner prescribed in this Agreement, the Manual and as otherwise directed from time-to-time by SpeeDee in writing, which shall be preserved for a period of not less than five (5) years after the close of Franchisee's fiscal year to which they relate.  Such books, records and accounts shall be open at all reasonable times to inspection and verification by SpeeDee or any of its agents or representatives.  Additionally, Franchisee shall prepare and submit to SpeeDee monthly and annual financial reports, in forms and formats as SpeeDee may prescribe in the Manual, which shall include a balance sheet and income statement and shall be prepared in accordance with generally accepted accounting principles.  Franchisee shall also submit copies of all sales tax reports.  Such reports shall be presented to SpeeDee within twenty (20) days of the end of each month.  SpeeDee shall be entitled, at any time, to have Franchisee's books and records (including Federal, State and local tax returns, bank statements and such other business documents relating to the Shop as determined by SpeeDee) examined or audited at SpeeDee's expense, and Franchisee shall cooperate fully with the party or parties making such examination or audit on behalf of SpeeDee.  If the examination or audit reveals that Gross Sales were underreported to SpeeDee, then Franchisee shall promptly pay the additional Royalty Fees and Marketing Fee, together with interest from the date payment was due, at a rate of eighteen percent (18%) per annum or the maximum rate then allowed by law.  If any examination or audit is necessitated by Franchisee's failure to submit monthly and annual financial reports as required herein or to maintain books and records as required by this Section 5.P, or in the event that the Gross Sales of the Shop reported by Franchisee for any accounting period are more than two percent (2%) below the actual Gross Sales of Franchisee for such period, as determined by any such examination or audit, then Franchisee shall immediately pay to Franchisor, the cost of such examination or audit (including reasonable accountants' and attorneys' fees and reasonable compensation for any time necessarily expended by SpeeDee's own employees and reimbursement for expenses necessarily incurred by them), as well as any additional amount of Royalty Fees and/or Marketing Fees shown to be due.  Such payments shall be without prejudice to any right of SpeeDee to terminate this Agreement on account of such defaults by Franchisee, in accordance with the terms of Article 12.

**Q.**    **Insurance**.  Franchisee shall procure an insurance policy or policies and SpeeDee and its parents and subsidiaries shall be named additional insureds in such policy or policies.  Such policy or policies shall be obtained and maintained as set forth by SpeeDee in the Manual or otherwise in writing as further described in Article 10.

**R.    Best Efforts.** Franchisee agrees that during the term of this Agreement to diligently develop the business and market and promote the Shop and to meet performance standards as may be set forth in the Manual. Franchisee or his Operating Partner, who owns at least ten percent (10%) of stock in the franchise, has gone through training, and is designated as the Operating Partner, must spend its, his and/or her best efforts on a full time basis in managing and promoting the daily business. Franchisee must devote full-time and use its, his and/or her best efforts, meet other requirements as set forth in the Manual and be responsible for management on a day to day basis. Franchisee must also diligently monitor and be responsible for the performance of its, his and/or her shop managers. Best efforts shall include, but not be limited to, the amount of time Franchisee shall devote to the Franchised Business and the number of visits per week which shall be made by Franchisee and/or his or her Operating Partner. The appointment of a manager shall not relieve Franchisee of any duties and obligations under this Agreement.

**S.    Approved Warranty Programs.** Franchisee shall participate in, comply with and honor all approved warranty programs and approved forms of warranties as described in this Agreement, in the Manual, or as issued by SpeeDee and/or any other SpeeDee Oil Change & Tune-Up Shop, at Franchisee's own expense. The terms, conditions and procedures of such approved warranty programs may be modified in the Manual by SpeeDee from time-to-time. Franchisee shall offer no other warranties, unless pre-approved by SpeeDee, in writing.

**T.    Brake Service Packages and Brake Pad and Shoe Approved Warranty Program.** Franchise shall offer and sell to customers three (3) distinct levels of brake service packages, which packages shall include the sale of different quality levels of brake pads and/or shoes with different warranty periods as further described in this Section 5.T. Franchisee shall comply with the following terms:

1.    Franchisee acknowledges that SpeeDee has issued a list of brake pads and shoes approved for use with certain brake service packages and warranties as described in this Section 5.T ("Approved Friction List"). Franchisee agrees that SpeeDee may, from time-to-time and in its sole discretion, modify the names of the brake service packages, the goods and services included in such packages and the approved lines of brake pads and shoes, revise, supplement, add or remove friction, otherwise modify the Approved Friction List and/or discontinue the brake service package offerings upon written notice to Franchisee by issuing supplemental bulletins, notices, revisions, modifications or amendments thereto, and other written (including electronic) directives. These revisions, modifications or amendments, as issued from time-to-time by SpeeDee, shall become a part of the Approved Friction List.

2.    Franchisee shall sell only those approved lines of brake pads and shoes on the Approved Friction List under the heading "Good" with a one (1) year limited warranty term.

3.    Franchisee shall sell only those approved lines of brake pads and shoes on the Approved Friction List under the heading "Better" with a three (3) year limited warranty term.

4.    Franchisee shall sell only those approved lines of brake pads on the Approved Friction List under the heading "Best" with a ten (10) year limited warranty term. Franchisee acknowledges that there are no brake shoes designated on the Approved Friction List under the "Best" heading and, therefore, Franchisee agrees that it will not sell any brake shoe with a ten (10) year limited warranty term.

5.    Franchisee agrees to provide to each customer who purchases a brake package printed warranty terms, as determined by SpeeDee in its sole discretion, applicable to the level of brake package purchased. SpeeDee may update the warranty terms upon written notice to Franchisee. In such event, Franchisee shall use the updated warranty terms on a going-forward basis.

6.      Franchisee shall honor and bear the cost of providing replacement brake pads or shoes, as applicable, for all friction warranties, including, without limitation, a one (1) year limited warranty, a three (3) year limited warranty and a ten (10) year limited warranty and Franchisee shall account for and/or accrue for future warranty redemptions as necessary to honor said warranties.

7.      Franchisee agrees to comply with all reasonable policies and procedures promulgated from time-to-time by SpeeDee relating to such warranties, including but not limited to the delivery and validation thereof, the honoring thereof, reimbursement between franchisees and as otherwise described in the Manual.

8.      Franchisee agrees to honor and to bear the cost of honoring each such printed warranty presented to Franchisee by the holder thereof, in accordance with the respective terms thereof and in accordance with policies and procedures promulgated by SpeeDee from time-to-time, irrespective of whether such warranty was furnished by Franchisee or by any other SpeeDee franchisee. If another SpeeDee franchisee provides replacement brake pads or shoes to a customer who purchased the same from Franchisee under the terms of the warranty, Franchisee shall reimburse such other SpeeDee franchisee in accordance with the Manual. Franchisee will replace the warranted brake pads or shoes only with new brake pads or shoes, as applicable, in the same category of "Good", "Better" or "Best" as originally purchased by the customer. Franchisee will make no charge to the customer for honoring any such printed warranty, except to the extent permitted by the express terms of the warranty. Where such terms permit the making of an installation charge, such charge shall not exceed an amount which is reasonable for the labor involved in installing the warranted brake pads or shoes.

9.      Franchisee shall offer no brake pad or shoe warranties other than as described herein or pre-approved by SpeeDee, in writing.

10.     If, within ninety (90) days after installing brake pads or shoes in the "Best" category, a customer returns complaining of any brake noise, Franchisee shall replace the brake pads or shoes at no cost (neither parts nor labor) to the consumer so that the brake noise is eliminated to the satisfaction of the customer. Franchisee understands that in some cases this may require multiple replacements of the brake pads or shoes.

Franchisee agrees that all brake pad and shoe warranties will be issued by the SpeeDee Shop that performs the service and will indicate that the warranties are valid at that shop only. All warranty terms and conditions and all point-of-purchase material will clearly indicate that it is the Franchisee of that shop that is issuing the warranty and not SpeeDee. Franchisee acknowledges and agrees that it, and not SpeeDee or its parent or affiliate companies, shall be responsible for any claims, liabilities or losses that may arise out of Franchisee's offering and/or honoring the warranties described herein, funding the cost of providing replacement brake pads and shoes under the warranties, offering customers quiet performance as described herein, using any brake package marketing materials provided by SpeeDee and for any breach of this Section 5.T at any time and for any reason. Accordingly and without limiting the scope of the indemnification provisions provided for in this Agreement, Franchisee further agrees to indemnify, defend and hold SpeeDee and its parent or affiliate companies harmless from and against any and all such claims, liabilities or losses.

U.      **Incorporation.** Upon incorporation for the purpose of operating the Shop, Franchisee shall execute the necessary documents required by SpeeDee which indicate the corporation is a co-franchisee under this Agreement.

V.      **Equity Register And Current Reports.** If Franchisee is a corporation, a limited liability company, a limited liability partnership, or a partnership, general or special (each, an "Entity"), it shall

maintain at all times an accurate register ("Equity Register") of the names and addresses of all owners of the outstanding equity interests in Franchisee, whether in the form of stock, units, member or partnership interests or other interests ("Equity Interests"). The identity of the owners of the Equity Interests shall not be changed without the prior written consent of SpeeDee, pursuant to Section 11.B. Franchisee shall notify SpeeDee in writing of any change in the ownership of Franchisee's Equity Interests within thirty (30) days of such change; provided that the requirement of such notice shall be in addition to the requirement that SpeeDee must grant its prior approval to any such change. Upon SpeeDee's request at any time, Franchisee shall submit a copy of the current Equity Register to SpeeDee. SpeeDee shall have the right to examine and copy the Equity Register at any time. Franchisee shall file with SpeeDee on January 15 of every year an annual report of record and beneficial owners as of December 31 of the prior year in the then-current form of the Entity Franchise Supplement. The current form of Entity Franchise Supplement is attached hereto as Exhibit C.

**W.** **Display and Use of Proprietary Marks**. Franchisee shall display the Proprietary Marks and Franchisee's business address and telephone number for the Shop on all promotional, sales and advertising materials, including, without limitation, all printed advertising of every kind and nature, stationery cards, signs and decals.

**X.** **Employment of Operations Manager**. If Franchisee or any entity controlled by or associated with Franchisee shall operate five (5) or more Shops, Franchisee shall employ one (1) Operations Manager for every five (5) Shops who must be pre-approved by SpeeDee, whose sole responsibilities shall include the oversight, supervision and coordination of those operations subject to the approval of SpeeDee. The Operations Manager shall meet all standards as described in the Manual including that the supervisory position shall be full-time and he shall not be employed in any other operational capacity.

## 6. PROPRIETARY MARKS.

**A.** **Grant of License**. SpeeDee hereby grants Franchisee the right and license to use the "SPEEDEE OIL CHANGE & TUNE-UP" trademarks and logos in connection with the operation of the Franchised Business and the provision of services and products to its customers. SpeeDee represents with respect to the Proprietary Marks that: (1) SpeeDee has, to the best of its knowledge, all right, title and interest in and to the Proprietary Marks; (2) SpeeDee and Franchisee shall take all steps, which it deems reasonably necessary, to preserve and protect the ownership and validity of such Proprietary Marks; and (3) SpeeDee will license Franchisee and other franchisees to use the Proprietary Marks only in accordance with the System and the operating standards and quality control specifications attendant thereto which underlie the goodwill associated with and symbolized by the Proprietary Marks.

**B.** **Obligations of Franchisee**. With respect to Franchisee's use of the Proprietary Marks pursuant to the license granted under this Agreement, Franchisee agrees that:

1. Franchisee shall use only the Proprietary Marks designated by SpeeDee in this Agreement or pursuant to the Manual and shall use them only in the manner required or authorized and permitted by SpeeDee.

2. Franchisee shall use the Proprietary Marks only in connection with the right and license to operate the Franchised Business granted hereunder.

3. During the term of this Agreement and any renewal hereof, Franchisee shall identify itself as a licensee and not the owner of the Proprietary Marks and shall make any necessary filings under state law to

reflect such status. In addition, Franchisee shall identify itself as a licensee of the Proprietary Marks on all invoices, order forms, receipts, business stationery and contracts, as well as the display of a notice in such form and content and at such conspicuous locations at the premises of the Franchised Business as SpeeDee may designate and in such fashion as SpeeDee may, in its sole and exclusive discretion, specify and require from time-to-time, in the Manual or otherwise.

4.     Franchisee's right to use the Proprietary Marks is limited to such uses as are authorized under this Agreement or in the Manual, and any unauthorized use thereof shall constitute an infringement of SpeeDee's rights and grounds for termination of this Agreement.

5.     Franchisee shall not use the Proprietary Marks to incur or secure any obligation or indebtedness.

6.     Franchisee shall not use the Proprietary Marks as part of its corporate or other legal name.

7.     Franchisee shall comply with SpeeDee's instructions in filing and maintaining the requisite trade name or fictitious name registrations, and shall execute any documents deemed necessary by SpeeDee or its counsel to obtain protection for the Proprietary Marks or to maintain their continued validity and enforceability.

8.     In the event that litigation involving the Proprietary Marks is instituted or threatened against Franchisee, Franchisee shall promptly notify SpeeDee and shall cooperate fully in defending or settling such litigation.

9.     Franchisee shall not register the Proprietary Marks for use on any electronic medium, including, without limitation, the Internet and/or associated with any domain and/or website names, addresses, etc. without the prior, express written consent and approval of SpeeDee.

    **C.**     **Acknowledgement of Franchisee**. Franchisee expressly understands and acknowledges that:

1.     SpeeDee is the owner of all right, title and interest in and to the Proprietary Marks and the goodwill associated with and symbolized by them.

2.     The Proprietary Marks are valid and serve to identify the System and those who are licensed to operate a SpeeDee Franchised Business in accordance with the System.

3.     Franchisee shall not directly or indirectly contest the validity or the ownership of the Proprietary Marks.

4.     Franchisee's use of the Proprietary Marks pursuant to this Agreement does not give Franchisee any ownership interest or other interest in or to the Proprietary Marks, except the nonexclusive license granted herein.

5.     Any and all goodwill arising from Franchisee's use of the Proprietary Marks at the Franchised Business in accordance with the System shall inure solely and exclusively to SpeeDee's benefit, and upon expiration or termination of this Agreement no monetary amount shall be assigned as attributable to any goodwill associated with Franchisee's use of the System or the Proprietary Marks.

6.     The license and rights to use the Proprietary Marks granted hereunder to Franchisee are nonexclusive, and SpeeDee thus may: (a) itself use, and grant franchises and licenses to others to use, the

Proprietary Marks and the System; (b) establish, develop and franchise other systems, different from the System licensed to Franchisee herein, without offering or providing Franchisee any rights in, to or under such other systems; and (c) modify or change, in whole or in part, any aspect of the Proprietary Marks or the System so long as Franchisee's rights thereto are in no way materially harmed thereby.

7.      SpeeDee reserves the right to substitute different names and Proprietary Marks for use in identifying the System, the Franchised Business and other SpeeDee Franchised Businesses operating thereunder.

8.      SpeeDee shall have no liability to Franchisee for any senior users which may claim rights to the Proprietary Marks.

9.      The Franchisee shall not register or attempt to register the Proprietary Marks in Franchisee's name or that of any other person, firm, entity or corporation.

## 7.      CONFIDENTIAL DAILY OPERATIONS MANUAL.

**A.      Operate Business in Accordance With Manual.** In order to protect the reputation and goodwill of SpeeDee and to maintain uniform operating standards under the Proprietary Marks, Franchisee shall conduct his business in strict accordance with the operational systems, procedures, policies, methods and requirements prescribed in the Manual and any supplemental bulletins, notices, revisions, modifications or amendments thereof and such other written directives of SpeeDee. Whenever this Agreement refers to a particular provision of the Manual, that provision shall have the same force and effect as if contained herein.

**B.      Confidentiality.** Franchisee acknowledges, knows and agrees that designated portions of the Manual contain trade secrets owned and treated as such by SpeeDee. Franchisee shall, therefore, at all times treat the Manual, any other manuals created for or approved for use in the operation of the Shop, and the information contained therein as confidential, and shall use reasonable efforts to maintain such information as secret and confidential. Franchisee shall not at any time, without SpeeDee's prior written consent, disclose any materials contained in the Manual or any other materials created for or approved for use in the operation of the Shop, in whole or in part, nor otherwise make the same available to any unauthorized person nor shall Franchisee copy, duplicate, record or otherwise reproduce in any manner any part of the Manual or any of the updates, supplements, or amendments thereto. The Manual shall at all times remain the sole property of SpeeDee and upon termination or expiration of this Agreement, Franchisee shall return said Manual and all updates thereto, to SpeeDee.

**C.      Updating the Manual.** Franchisee shall at all times ensure that its copy of said Manual is kept current and up-to-date and, in the event of any dispute as to the contents of said Manual, the terms of the master copy of the Manual maintained by SpeeDee at SpeeDee's international headquarters shall be controlling.

**D.      Replacement Fee.** If Franchisee loses all or any portion of the Manual, or if Franchisee's copy thereof is destroyed, stolen or damaged, then Franchisee must order a replacement Manual, which will be made available from SpeeDee for the then-current fee.

## 8.      CONFIDENTIAL INFORMATION.

**A.      Non-disclosure.** Franchisee shall not, during the term of this Agreement or thereafter, communicate, divulge, or use for the benefit of any other person, persons, partnership, association, or

corporation any confidential information, knowledge, or know-how concerning the methods of operation of the business franchised hereunder which may be communicated to Franchisee, or of which Franchisee may be apprised, by virtue of Franchisee's operation of the Shop under the terms of this Agreement. Franchisee shall divulge such confidential information only to such of its employees as must have access to it in order to operate the Shop. Any and all information, knowledge, and know-how, including, without limitation, drawings, materials, equipment, specifications, techniques, and other data, which SpeeDee designates as confidential shall be deemed confidential for purposes of this Agreement, except information which (i) Franchisee can demonstrate came to its attention prior to disclosure thereof by SpeeDee, or (ii) at the time of disclosure by SpeeDee to Franchisee, had become a part of the public domain, through publication or communication by others, or (iii) after disclosure to Franchisee by SpeeDee, becomes a part of the public domain, through publication or communication by others.

      **B.**    **Confidentiality Agreement**. Franchisee may divulge confidential information only to such of Franchisee's officers, directors, shareholders, partners, members, employees and independent contractors as require access to it in order to operate the Shop, provided that Franchisee shall require said officers, directors, shareholders, partners, members and employees to comply with Franchisee's confidentiality and non-disclosure obligations as described herein.

      **C.**    **Franchisee Developments**. SpeeDee shall have the exclusive right to use and incorporate in the System for the benefit of other franchisees and SpeeDee, any modifications, changes, and improvements to the System, in whole or in part, developed or discovered by Franchisee or Franchisee's employees or agents in connection with the System or the operation of the Shop, without any liability or obligation to Franchisee or the developer thereof. This may include, but is not limited to, discoveries or developments of products, systems or techniques, management practices or procedures, architectural designs and philosophies and names or groups of words relating to the System.

## 9.    NATIONAL AND LOCAL ADVERTISING.

      Recognizing the value of advertising to the System, and the importance of the standardization of advertising programs to the furtherance and protection of the goodwill and public image of the System, the parties agree as follows:

      **A.**    **Submission and Approval of Advertising**. All advertising by Franchisee in any medium shall be conducted in a dignified manner and shall conform to such standards and requirements as SpeeDee may specify from time-to-time in the Manual or otherwise. Franchisee shall submit to SpeeDee for its prior approval, samples of all advertising and promotional plans and materials in whatever form that Franchisee desires to use and that have not been previously approved within the last six (6) months by SpeeDee. Franchisee shall comply with all revisions to said advertising which SpeeDee may require prior to approving said advertising. Franchisee shall not use any advertising or promotional plans or materials which have not been approved by SpeeDee, and shall cease to use any plans or materials promptly upon notice by SpeeDee. Failure by Franchisee to obtain the prior approval of SpeeDee for all proposed advertising shall be deemed a default of this Agreement in accordance with Section 12.B.

      **B.**    **Grand Opening Advertising Promotion**. In connection with the grand opening promotion for the opening of the Shop, Franchisee shall spend no less than Five Thousand Dollars ($5,000) and generally not greater than Ten Thousand Dollars ($10,000) on advertising, promotions and/or publicity as approved by SpeeDee in connection with such grand opening. The grand opening promotion shall run during the period from fifteen (15) days before to thirty (30) days after the opening of the Shop. Franchisee must finish spending

this amount, in full, no later than one hundred eighty (180) days after the opening of the Shop for business. Franchisee will pay the grand opening fee to SpeeDee, in advance, and SpeeDee will reimburse Franchisee up to this amount when it supplies receipts for the grand opening promotion. Proof of such expenditures (in the form of cancelled checks, paid invoices, copies of advertisements or otherwise) shall be submitted to SpeeDee within sixty (60) days following each related expense.

      **C.**     <u>Marketing Fee</u>. Franchisee agrees that building consumer awareness of the System and the Shop on a national, regional and local basis is important and to that end Franchisee shall pay to SpeeDee the Marketing Fee as described in Section 4.A.4. All Marketing Fees shall be paid directly to SpeeDee and Franchisee agrees that SpeeDee may collect reasonable and actual administrative and overhead costs associated with its collection and management of the Marketing Fee and associated advertising and marketing programs. **SpeeDee has the sole discretion to determine how the Marketing Fees will be spent including, without limitation, to pay for, among other things, support programs, media advertising, consumer research, internet initiatives, customer retention programs, store image initiatives, system-wide POP materials, instructional materials regarding marketing programs and initiatives and customer perception initiatives, along with franchisee meetings, conventions, conferences and interaction to facilitate and promote franchisee input regarding marketing programs and usage and success of advertising and marketing programs. SpeeDee does not guarantee that any Marketing Fee will be spent in the geographic area within which the Shop is located or that the advertising or marketing programs will increase Franchisee's gross sales or profitability. SpeeDee may allocate the Marketing Fees among the several advertising and marketing programs it has established and may change those allocations from time-to-time, in its sole discretion, without prior notice. This right to allocate the Marketing Fees to various programs includes the rights, among others, to create new programs, modify the programs, eliminate one or more of the programs and redirect amounts allocated to one program to another. SpeeDee may also require, at its discretion, that Franchisee participate in regional and/or local advertising cooperatives.**

      **D.**     <u>Procedures for Increasing Marketing Fees</u>. Each SpeeDee franchisee shall vote separately for any increase in the Marketing Fees. Written approval of two thirds (2/3) of all franchisees in the applicable market, voting on the basis of one (1) vote per open and operating Shop in good standing shall be necessary for any increase in Marketing Fees.

      **E.**     <u>Participation</u>. To the extent permitted by law, Franchisee agrees to participate in any and all existing advertising promotional and public relations programs beginning the week during which Franchisee first opens its Shop and continuously thereafter. SpeeDee will provide Franchisee with a summary of any such programs upon Franchisee's request.

      **F.**     <u>Supplier Advertising Contributions</u>. Where SpeeDee has designated an approved brand name supplier and such supplier has agreed to make payments with respect to such approved products or services conditioned on use, sales or otherwise by SpeeDee or affiliated entities, all such payments by the supplier shall be made to SpeeDee or an entity appointed by it and shall be spent by SpeeDee or such entity in accordance with any restrictions or conditions imposed by the supplier. If no conditions are placed on the use of such funds, SpeeDee has sole discretion for the use of said funds. Any non-cash consideration which is given to SpeeDee by any supplier shall not be subject to any restrictions on use by SpeeDee.

## 10.   <u>INSURANCE</u>.

      Franchisee shall obtain and maintain insurance policies as set forth in the Manual and as follows. Franchisee shall procure and thereafter maintain in full force and effect during the term of this Agreement garage keeper liability insurance ($60,000 minimum requirement), employer liability insurance ($1 million

minimum requirement), auto insurance ($2 million minimum requirement) and general business liability, errors and omissions insurance in an amount of One Million Dollars ($1,000,000) per incident per licensed Shop with One Million Dollars ($1,000,000) total coverage in forms providing coverage with insurers approved. in writing and in advance by SpeeDee, naming SpeeDee, its parents and subsidiaries as additional insured parties. Such general business liability, errors and omissions insurance must be obtained prior to the opening of the Shop. Franchisee shall be obligated, prior to opening, to provide SpeeDee with certificates for such insurance which show that the insurance is not cancelable without thirty (30) days prior notice to SpeeDee. Should Franchisee, for any reason, not procure and maintain insurance coverage required by this Agreement, SpeeDee will have the right, but not the obligation, to procure such insurance and upon notice, Franchisee will pay and reimburse SpeeDee for all costs of same.

## 11.   TRANSFERABILITY OF INTEREST.

### A.   Transfer by SpeeDee.

SpeeDee shall have the right to assign this Agreement, and all of its rights and privileges hereunder, to any person, firm, corporation or other entity provided that, with respect to any assignment resulting in the subsequent performance by the assignee of the functions of SpeeDee: (i) the assignee shall, at the time of such assignment, be financially responsible and economically capable of performing the obligations of SpeeDee hereunder, and (ii) the assignee shall expressly assume and agree to perform such obligations. Specifically, and without limitation to the foregoing, Franchisee expressly affirms and agrees that SpeeDee may sell its assets, its Proprietary Marks, or its System outright to a third party; may go public; may engage in a private placement of some or all of its securities; may merge, acquire other corporations, or be acquired by another corporation; may undertake a refinancing, recapitalization, leveraged buyout or other economic or financial restructuring; and, with regard to any or all of the above sales, assignments and dispositions, Franchisee expressly and specifically waives any claims, demands or damages arising from or related to the loss of said Proprietary Marks (or any variation thereof) and/or the loss of association with or identification of "SpeeDee Oil Change Systems, Inc." as SpeeDee hereunder.

Nothing contained in this Agreement requires SpeeDee to remain in the automobile care service business or to offer services similar to those currently being offered by it or any related company, whether or not bearing the Proprietary Marks in the event SpeeDee exercises its rights hereunder to assign its rights in this Agreement.

### B.   Transfer by Franchisee.

Franchisee understands and acknowledges that the rights and duties set forth in this Agreement are personal to Franchisee, and that SpeeDee has granted this franchise in reliance on the business skill, financial capacity, and personal character of Franchisee and, if Franchisee is an Entity, the business skills, financial capability and personal character of the owners of the Equity Interests of Franchisee.

1.   Transfer of Equity Interests. No record or beneficial owner of any Equity Interest in Franchisee may sell, assign, donate or otherwise transfer, or mortgage, pledge or other hypothecate, such Equity Interest and Franchisee may not sell or agree to sell or grant any option, warrant or right to acquire, any Equity Interest in Franchisee, without the prior written consent of SpeeDee.

2.     Transfer of Business. Franchisee may not sell, assign, transfer, convey, give away, pledge, mortgage, or otherwise encumber this Agreement, or all or a substantial portion of Franchised Business without the prior written consent of SpeeDee.

3.     Breach. Any purported transfer in violation of paragraphs 1 or 2 of this Section 11.B, whether by operation of law or otherwise, shall be null and void and shall constitute a material breach of this Agreement for which SpeeDee may thus terminate this Agreement without opportunity to cure pursuant to Article 12.

4.     Conditions to Transfer. SpeeDee shall not unreasonably withhold its consent to a transfer of any interest in Franchisee, this Agreement, or all or a substantial portion of the assets of the Franchised Business, subject to the satisfaction of the following conditions which SpeeDee may impose:

a.     All of Franchisee's accrued monetary obligations and all other outstanding obligations to SpeeDee, its subsidiaries, affiliates and suppliers shall be up to date, fully paid and satisfied;

b.     Franchisee shall not be in default of any provision of this Agreement, any amendment hereof or successor hereto, any other franchise agreement or other agreement between Franchisee and SpeeDee, or its subsidiaries, affiliates or suppliers;

c.     Franchisee and each of its, his and/or her officers, directors, managers, partners and record and beneficial owners of its outstanding Equity Interests shall have executed a general release, in a form satisfactory to SpeeDee, of any and all claims against SpeeDee, its subsidiaries and/or affiliates and their respective officers, directors, shareholders and employees in their corporate and individual capacities, including, without limitation, claims arising under federal, state and local laws, rules and ordinances, provided, however, that Franchisee shall not be required to release SpeeDee for violations of federal and state franchise registration and disclosure laws;

d.     The transferee shall enter into a written assignment, in a form satisfactory to SpeeDee, assuming and agreeing to discharge all of Franchisee's obligations under this Agreement; and, if the obligations of Franchisee were guaranteed by the transferor, the transferee shall guarantee the performance of all such obligations in writing in a form satisfactory to SpeeDee;

e.     The transferee shall demonstrate to SpeeDee's satisfaction that the transferee meets SpeeDee's educational, managerial and business standards; possesses a good moral character, business reputation and credit rating; has the aptitude and ability to operate the Franchised Business herein (as may be evidenced by prior related experience or otherwise); has at least the same managerial and financial criteria required of new franchisees and shall have sufficient equity capital to operate the Franchised Business;

f.     At SpeeDee's option, the transferee shall execute (and/or, upon SpeeDee's request, shall cause all interested parties to execute) the standard form of franchise agreement then being offered to new franchisees and such other ancillary agreements as SpeeDee may require, including, without limitation, the Real Estate Documents, which agreements shall supersede this Agreement in all respects and the terms of which agreements may differ from the terms of this Agreement, including, without limitation, different terms, different percentage Royalty Fees, different Marketing Fees and the implementation of additional fees;

g.      The transferee shall upgrade and renovate, at the transferee's expense, the Shop to conform to the current specifications then being used in new SpeeDee Shops, and shall complete the upgrading and other requirements within the time specified by SpeeDee;

h.      The Franchisee shall cause the transferee to pay to SpeeDee a nonrefundable transfer fee of (i) Five Thousand Dollars ($5,000) if transferee is an existing SpeeDee franchisee or (ii) Ten Thousand Dollars ($10,000) if transferee is a new SpeeDee franchisee to cover SpeeDee's expenses in connection thereof which may include, but not be limited to, orientation and training. Notwithstanding the foregoing, Franchisee shall, at all times, remain liable for this transfer fee if unpaid by transferee;

i.      Franchisee shall remain liable for all direct and indirect obligations to SpeeDee in connection with the Franchised Business prior to the effective date of the transfer and shall continue to remain responsible for its obligations of non-disclosure, non-competition and indemnification as provided elsewhere in this Agreement and shall execute any and all instruments reasonably requested by SpeeDee to further evidence such liability;

j.      In addition to the obligations contained in subparagraph (i) above, Franchisee shall also remain liable, as a primary obligor, for all direct and indirect obligations of the transferee commencing on the effective date, expressly and unequivocally guaranteeing the transferee's performance thereof pursuant to this Agreement, as transferred;

k.      At the transferee's expense, the transferee and/or its manager and employees shall complete the initial franchisee orientation and any training programs then in effect for current franchisees upon such terms and conditions as SpeeDee may reasonably require; and

l.      The transferee shall have signed a receipt acknowledging its receipt of the Franchise Disclosure Document, the then-current franchise agreement and ancillary agreements.

m.      Any person(s) who is to be designated as the manager of the Shop but is not also an owner of Equity Interests in Franchisee shall be subject to SpeeDee's approval.

5.      Security Interest.  Franchisee shall grant no security interest in the Franchised Business or in any of its assets unless the secured party agrees that in the event of any default by Franchisee under any documents related to the security interest, SpeeDee shall have the right and option to be substituted as obligor to the secured party and to cure any default of Franchisee. Notwithstanding the foregoing, SpeeDee shall not be construed as a guarantor or surety for Franchisee.

6.      Conditions.  Franchisee acknowledges and agrees that each of the foregoing conditions of transfer is necessary and reasonable to assure the transferee's full performance of the obligations hereunder.

7.      SpeeDee's Right of First Refusal.  Anything contained herein to the contrary notwithstanding, if Franchisee desires to transfer its rights hereunder, Franchisee shall submit a bona fide written letter of intent, agreement or offer signed by the potential transferee or purchaser to SpeeDee. SpeeDee shall have the option, exercisable within thirty (30) days after receipt of such bona fide written agreement, letter of intent or offer, to purchase or cause a third party designated by SpeeDee to purchase the Shop and/or Franchise interest, upon the same terms and conditions as contained in the bona fide letter of intent, agreement or offer furnished SpeeDee.

**C.**    **Additional Requirements - Entities and Equity Interest Holders.**   The following requirements, in addition to those set forth elsewhere in this Agreement, the Manual or otherwise, shall apply to Franchisee if Franchisee is an entity:

  1.    Entity Organizational Requirements.

  a.    Franchisee shall be a newly organized Entity and its organization documents shall at all times provide that its activities are confined exclusively to operating the Franchised Business.

  b.    Copies of Franchisee's organizational documents, including Articles of Incorporation or Organization, Operating Agreement or Bylaws, and other governing documents, and any amendments thereto, including appropriate resolutions or consents authorizing the execution of this Agreement, shall be furnished to SpeeDee.

  c.    Each certificate of ownership of an Equity Interest in Franchisee shall have conspicuously endorsed upon its face a statement in a form satisfactory to SpeeDee, such as:

  THE TRANSFER, PLEDGE OR ALIENATION OF THIS (NAME OF EQUITY INTEREST) IS SUBJECT TO THE TERMS AND RESTRICTIONS CONTAINED WITHIN THE FRANCHISE AGREEMENT BETWEEN SPEEDEE WORLDWIDE CORPORATION AND (ENTITY NAME).

  2.    Equity Interest Holder Guarantee.

  Each record and beneficial owner of any Equity Interest in Franchisee shall jointly and severally guarantee Franchisee's obligations under this Agreement.

**D.**    **Transfer Upon Death or Permanent Incapacity.**  Upon the death or permanent incapacity (as determined by a physician acceptable to SpeeDee) of any person who owns an Entity Interest in Franchisee, this Agreement, or all or a substantial portion of the assets of the Franchised Business, and upon the dissolution of a Franchisee that is an entity, the executor, administrator, personal representative, or trustee of such person or Entity shall transfer its, his or her interest to a third party approved by SpeeDee within ninety (90) days of such death or permanent incapacity, or such dissolution. Such transfers, including, without limitation, transfers by devise or inheritance, shall be subject to the same conditions as any transfer pursuant to Section 11.B. However, in the case of transfer by devise or inheritance, if the heirs or beneficiaries of any such person are unable to meet the conditions in this Article 11 imposed by SpeeDee, the personal representative of the deceased person shall have an additional thirty (30) days to dispose of the deceased's interest, which disposition shall be subject to all the terms and conditions for transfers contained in this Article 11. Upon the death or permanent incapacity of Franchisee, SpeeDee may terminate this Agreement upon thirty (30) days written notice to Franchisee's last known business address unless the above procedures for transfer are met.

**E.**    **Non-Waiver of Claims.**  SpeeDee's consent to a transfer of any interest in Franchisee, this Agreement, or all or a substantial portion of the assets of the Franchised Business shall not constitute a waiver of any claims it may have against the transferring party, nor shall it be deemed a waiver of SpeeDee's right to demand exact compliance with any of the terms of this Agreement by the transferee.

**F.    No Release of Franchisee's Liability.**  No assignment or any other transfer by Franchisee, with or without SpeeDee's consent, during the term of this Agreement or any renewal period shall release Franchisee from any liability under the terms of this Agreement nor shall Franchisee be relieved of the obligations of performing any of the terms, covenants and conditions of this Agreement.

## 12.    DEFAULT AND TERMINATION.

**A.    Immediate Termination Upon Notice to Franchisee and No Opportunity to Cure.**  Franchisee shall be deemed to be in default and SpeeDee may, at its option, terminate this Agreement and any other agreement between SpeeDee or its affiliate and all rights granted hereunder and thereunder immediately, upon notice, without opportunity to cure (except as otherwise required by law), if:

1.    Franchisee shall become insolvent or make a general assignment for the benefit or creditors; if a petition in bankruptcy is filed by Franchisee, or such a petition is filed against Franchisee and not discharged within sixty (60) days; if Franchisee is adjudicated a bankrupt; if a bill in equity or other proceeding for the appointment of a receiver of Franchisee or other custodian for Franchisee's business or assets is filed or consented to by Franchisee; if a receiver or other custodian (permanent or temporary) of Franchisee's assets or property, or any part thereof, is appointed by any court of competent jurisdiction; if proceedings for a composition with creditors under any state or federal law should be instituted by or against Franchisee; if a final judgment remains unsatisfied or of record for thirty (30) days or longer (unless supersedes bond is filed); if execution is levied against Franchisee's business or property, or a suit to foreclose any lien or mortgage against the Approved Location, equipment, or inventory is instituted against Franchisee and not dismissed within thirty (30) days; or if the real or personal property of Franchisee's franchise shall be sold after levy thereupon by any sheriff, marshal, or constable;

2.    If Franchisee has received from SpeeDee two (2) or more notices of default pursuant to Section 12.B for the same, similar or different defaults within any one-year period, in which event a notice of termination may be sent in lieu of any subsequent notice to cure;

3.    If Franchisee ceases to do business at the Shop, otherwise abandons the business franchised hereunder, or fails within thirty (30) days (or, if shorter, within the relevant cure period, if any, in any lease or sublease for the Shop), to remedy any default under any note, lease, or sublease for the Shop, or for the equipment or inventory therein, or loses the right to possession of the Shop or otherwise forfeits the right to do or transact business in the jurisdiction where the Shop is located, provided, however, that if any such loss of possession results through no fault of Franchisee, and the premises are damaged or destroyed by a disaster such that they cannot, in SpeeDee's judgment, reasonably be restored, or Franchisee is not permitted under the lease or sublease for the Shop to restore, then this Agreement shall not be terminated for that reason for a period of sixty (60) days thereafter, provided SpeeDee has approved (i) a site within that time to which Franchisee shall relocate for the remainder of the term hereof and (ii) Franchisee's schedule for reopening, which approval shall not be unreasonably withheld;

4.    If, in the sole and absolute discretion of SpeeDee, Franchisee fails to complete, to SpeeDee's satisfaction, the franchisee orientation and/or other training at least thirty (30) days prior to opening;

5.    If Franchisee purports to transfer any rights or obligations arising from this Agreement to any third party without SpeeDee's prior written consent, contrary to the requirements of Article 11;

6.      If Franchisee is or was convicted of a felony, a crime involving moral turpitude, or any other crime or offense that will, in the sole opinion of SpeeDee, adversely affect the System, the Proprietary Marks, the goodwill associated therewith, or SpeeDee's interest therein;

7.      If Franchisee fails to comply with any of the covenants contained in Article 14;

8.      If Franchisee uses Proprietary Marks in an unauthorized manner contrary to Article 6 or otherwise impairs the goodwill associated therewith or SpeeDee's rights therein;

9.      If Franchisee discloses or divulges the contents of the Manual or other trade secret or confidential information contrary to Articles 7 and 8;

10.     If the provisions for transfer by Franchisee upon death, mental incapacity or disability, described in Section 11.D are not strictly followed;

11.     If Franchisee knowingly maintains false books or records or submits any false or misleading statements, applications or reports to SpeeDee;

12.     If Franchisee fails to find a site for the Franchised Business and submit it to SpeeDee for approval within one hundred eighty (180) days following the execution of this Agreement;

13.     If Franchisee fails or refuses to obtain SpeeDee's approval or consent as required by this Agreement; or

14.     If Franchisee fails to open the Shop for business within one hundred eighty (180) days after SpeeDee's approval of a site.

15.     Franchise fails to execute the applicable Real Estate Documents as required by Section 5.A.6.

**B.      Default Notice of Termination With Thirty (30) Days Opportunity to Cure.**  Except as provided in Section 12.A, Franchisee shall have thirty (30) days after its receipt from SpeeDee of written notice of default within which to remedy any default hereunder and to provide evidence of such remedy to SpeeDee. If any such default is not cured within the thirty (30) day period, or such longer period as applicable law may require, then SpeeDee, at its option, may terminate this Agreement and any other agreement between Franchisee and SpeeDee or its affiliate, effective immediately upon expiration of the thirty (30) day period (or such longer period as applicable law may require). Franchisee shall be in default hereunder upon any of the following events:

1.      If Franchisee fails to comply with any of its requirements imposed by this Agreement;

2.      If Franchisee, by act or omission, suffers a violation, in connection with the operation of the franchise, of any law, ordinance, rule or regulation of a government agency, in the absence of a good faith dispute over its application or legality and without promptly resorting to an appropriate administration or judicial forum for resolution thereof;

3.      If Franchisee fails to operate the Franchised Business in strict accordance with the Manual as it may be supplemented and modified from time-to-time;

4.      If Franchisee fails to obtain the prior approval of SpeeDee of any and all advertising or promotional plans and materials in whatever form used by Franchisee in connection with its promotion of the Franchised Business;  or

5.      If Franchisee refuses, neglects, fails to perform, or breaches any provision of this Agreement or any other Agreement with SpeeDee and/or any entity associated with either or any agreement between Franchisee and any SpeeDee Oil Change & Tune-Up approved supplier or defaults under the terms of any such agreement(s) including default of any payment or other obligations and fails to cure any such neglect, failure, default or breach within ten (10) days of written notice to Franchisee of such neglect, failure, default or breach.

**C.      No Limitation on Remedy**.  No right or remedy herein conferred upon or reserved to SpeeDee is exclusive of any other right or remedy provided or permitted by law or equity.

**D.      Non-exclusivity**.  The events of default and grounds for termination described in this Article 12 shall be in addition to any other grounds for termination contained elsewhere in this Agreement or otherwise.

**E.      Acceleration upon Default**.  On default by Franchisee, in addition to paying all amounts then due to SpeeDee, Franchisee shall also be obligated to pay, and shall on receipt of written demand by SpeeDee, promptly pay SpeeDee the minimum Royalty Fees and Marketing Fees due for the remainder of the term of this Agreement.  To calculate this sum, Franchisee shall pay the greater of: (a) the average Gross Sales from the preceding three (3) years; (b) the highest Gross Sales figure from any one (1) year (or fraction thereof when operations are less than one (1) year), which figure shall be multiplied by the percentage of fees payable for royalties and Marketing Fees; or (c) the minimum weekly Royalty Fee of Two Hundred Twenty Five Dollars ($225) and the minimum weekly Marketing Fee of Two Hundred Twenty Five Dollars ($225) which shall be multiplied by fifty two (52) weeks.  This amount shall be multiplied by the remaining years of the Agreement and then discounted to the present value using an interest rate of eight percent (8%).  In the event of termination for any default of Franchisee, such sums shall include all damages, costs and expenses, including reasonable attorneys' fees, incurred by SpeeDee as a result of the default, which obligation shall give rise to and remain, until paid in full, a lien in favor of SpeeDee against any and all of the personal property, fixtures, equipment and inventory owned by Franchisee and on the premises of the Shop at the time of default.

**F.      Cross Default**.  Any default by Franchisee under this Agreement shall cause a default under any and all agreements between Franchisee and SpeeDee or any affiliate of SpeeDee.

## 13.      OBLIGATIONS UPON TERMINATION.

Upon termination or expiration, this Agreement, and all rights granted hereunder to Franchisee, shall forthwith terminate, and Franchisee shall immediately cease to operate the Shop and the business franchised under this Agreement, and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former franchisee of SpeeDee.  The Franchisee shall be required to comply with the following obligations and all other obligations upon termination contained in the Manual or otherwise provided in writing by SpeeDee:

**A.      Cessation of Operation**.  Franchisee must immediately cease to operate the business franchised herein, and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former franchisee of SpeeDee.

**B.    Cessation of Use of System**. Franchisee must immediately and permanently cease to use, by advertising or in any manner whatsoever, confidential methods, procedures, and techniques associated with the System, including, without limitation, the name "SPEEDEE OIL CHANGE & TUNE-UP" and any other Proprietary Marks and distinctive trade dress, forms, slogans, signs, symbols, logo or devices associated with the System. In particular, Franchisee shall cease to use, without limitation, all signs, fixtures, furniture, equipment, advertising materials or promotional displays, stationery, forms and other articles which display the Proprietary Marks associated with the System. Franchisee agrees to immediately return these items to SpeeDee.

**C.    Cessation of Use of Marks**. Franchisee must take such action as may be necessary to cancel or assign to SpeeDee or SpeeDee's designee any assumed name or equivalent registration which contains the Proprietary Marks or any other service mark, trade name or trademark of SpeeDee, and Franchisee shall furnish SpeeDee with evidence satisfactory to SpeeDee of compliance with this obligation within thirty (30) days after termination or expiration of this Agreement.

**D.    Option to Purchase Assets**. In the event of termination of this Agreement for any reason, SpeeDee shall have the right and option, but is not obligated, to purchase Franchisee's interest in the tangible assets of the Franchised Business. SpeeDee shall notify Franchisee, in writing, within thirty (30) days of termination of this Agreement of its intent to exercise said right and option. In the event that SpeeDee elects to purchase Franchisee's interest in the tangible assets of the Franchised Business, SpeeDee shall pay the fair market value, less any sums of money owed by Franchisee to SpeeDee and less any sums necessary to acquire clear title to the interest. In the event that SpeeDee and Franchisee are unable to agree on the fair market value of said assets, an independent appraiser shall be appointed to determine the fair market value and the determination of said appraiser shall be binding upon the parties. The costs and expenses associated with the appointment of an independent appraiser shall be paid by Franchisee. In the event that SpeeDee does not elect to exercise its option to acquire the tangible assets, Franchisee shall make such modifications or alterations to the premises of the Shop immediately upon termination or expiration of this Agreement as may be necessary to distinguish the appearance of said premises from that of other SpeeDee Shops under the System, and shall make such specific additional changes thereto as SpeeDee may reasonably request for that purpose. In the event Franchisee fails or refuses to comply with the requirements of this Article 13, SpeeDee shall have the right to enter upon the premises of the Shop, without being guilty of trespass or any other tort, for the purpose of making or causing to be made such changes as may be required, at the expense of Franchisee, which expense Franchisee agrees to pay upon demand.

**E.    Option to Continue Operations**. In the event this Agreement is terminated, SpeeDee may, at its option, immediately enter the premises of the Franchised Business and continue to provide services to clients or customers of the Franchised Business and apply net receipts therefrom to debts owed to SpeeDee by Franchisee. Franchisee hereby assigns all accounts receivables of the Shop to SpeeDee, with recourse. SpeeDee shall have no other obligations to Franchisee in connection with SpeeDee's operation of the Franchised Business following said termination.

**F.    Non-usage of Marks**. Franchisee agrees, in the event it continues to operate or subsequently begins to operate any other business, not to use any reproduction, counterfeit, copy or colorable imitation of the Proprietary Marks, either in connection with such other business or the promotion thereof, which is likely to cause confusion, mistake or deception, or which is likely to dilute SpeeDee's exclusive rights in and to the Proprietary Marks, and agrees not to utilize any designation of origin or description or representation which falsely suggests or represents an association or connection with SpeeDee so as to constitute unfair competition.

**G.**     **Payment of Costs.**  Franchisee shall pay to SpeeDee all damages, costs and expenses, including reasonable attorneys' fees, incurred by SpeeDee subsequent to the termination or expiration of this Agreement in obtaining injunctive or other relief for the enforcement of any provisions of this Article 13.

**H.**     **Return of Materials.**  Franchisee shall immediately turn over to SpeeDee all copies of all materials in Franchisee's possession including the Manual, all records, files, instructions, correspondence, brochures, agreements, disclosure statements, any and all computer data bases of customer lists or other information related to the goodwill of the business, and any and all other materials relating to the operation of the Franchised Business in Franchisee's possession, and all copies thereof (all of which are acknowledged to be SpeeDee's property), and shall retain no copy or record of any of the foregoing, excepting only Franchisee's copy of this Agreement and of any correspondence between the parties and any other documents  which Franchisee reasonably needs for compliance with any  provision of law.  In addition to the foregoing, if requested by SpeeDee, Franchisee shall deliver to SpeeDee a complete list of all persons employed by Franchisee during the three (3) years immediately preceding termination, together with employment dates and contact information for each employee on such list.  All costs of delivering all materials required by this Article 13 shall be borne by Franchisee.

**I.**     **Notifications.**  Franchisee shall promptly notify the appropriate telephone company and all telephone directory listing agencies of the termination or expiration of this Agreement and Franchisee's right to use any telephone number(s), facsimile numbers and any regular, classified or other telephone directory listings associated with the Shop and/or any Proprietary Marks and shall authorize the transfer of the same to SpeeDee or SpeeDee's designee.  Franchisee agrees to execute updated letters of direction to any telephone companies and telephone directory listing agencies directing said companies and agencies to transfer to SpeeDee all  of Franchisee's right to use any such telephone number(s), which SpeeDee may hold until termination or expiration hereof.  Franchisee acknowledges that as between SpeeDee and Franchisee, SpeeDee has the sole right to and interest in all telephone numbers, facsimile numbers and directory listings associated with the Shop and/or any Proprietary Marks.  Franchisee authorizes SpeeDee, and hereby appoints SpeeDee and any officer of SpeeDee as its attorney in fact, to direct the appropriate telephone company and all listing agencies to transfer all such numbers and listings to SpeeDee upon termination or expiration of this Agreement.

**J.**     **SpeeDee's Option to Purchase.**  SpeeDee shall have the right (but not the duty) to be exercised by notice of intent to do so within thirty (30) days after termination or expiration, to purchase any or all of the signs, advertising materials, promotional displays, supplies, forms, inventory or other items bearing SpeeDee's Proprietary Marks, at Franchisee's cost or fair market value or cost, whichever is less.  If the parties cannot agree on fair market value within a reasonable time, an independent appraiser shall be designated by SpeeDee and his determination shall be binding.  If SpeeDee elects to exercise any option to purchase provided herein, it shall have the right to set off all amounts due from Franchisee under this Agreement and the cost of the appraisal, if any, against any payment thereof.

**K.**     **Covenant of Further Assurances.**  Franchisee shall execute any legal document that may be necessary to effectuate the termination hereunder and shall furnish to SpeeDee, within thirty (30) days after the effective date of termination, written evidence satisfactory to SpeeDee of Franchisee's compliance with the foregoing obligations.

**L.**     **Compliance with Covenants.**  Franchisee shall comply with all applicable covenants contained in Article 14.

**M.**     **No Further Interest**.  Other than as specifically set forth above, Franchisee shall have no interest in the Franchised Business upon termination or expiration of this Agreement.

**14.**     **COVENANTS**.

**A.**     **Full-Time and Best Efforts**.  Franchisee and all owners of any Equity Interests in Franchisee shall devote full time, energy, and best efforts, to the management and operation of the Shop.

**B.**     **Non-Solicitation and Non-Competition**.  Franchisee covenants and acknowledges that Franchisee (and, if Franchisee is an entity, each of the owners of the Equity Interests in Franchisee), pursuant to this Agreement, will receive valuable specialized training and confidential and other information regarding the business, promotional, sales, marketing and operational methods and techniques of SpeeDee and the System.

1.     Franchisee covenants that during the term of this Agreement and subject to the post-term provisions contained herein, except as otherwise approved in writing by SpeeDee, Franchisee shall not, either directly or indirectly, for itself or through, on behalf of or in conjunction with any person, persons, partners or corporation:

(a)     Divert or attempt to divert any business or customer of the Franchised Business to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with SpeeDee's Proprietary Marks and the System;

(b)     Employ or seek to employ any person who is at that time employed by SpeeDee or by any other Franchisee or otherwise directly or indirectly induce such person to leave his or her employment; or

(c)     Own, maintain, engage in, be employed by, advise, assist, invest in, franchise, make loans to or have any interest in any business which is the same as or substantially similar to the Franchised Business.

2.     Franchisee covenants that, except as otherwise approved in writing by SpeeDee, Franchisee shall not, for a continuous uninterrupted period commencing upon the expiration or termination of this Agreement, regardless of the cause for termination, and continuing for two (2) years thereafter, either directly or indirectly, for itself or through, on behalf of or in conjunction with any person, persons, partnership or corporation, own, maintain, engage in, be employed by, advise, assist, invest in, franchise, make loans to, or have any interest in any business which is the same as or substantially similar to the Franchised Business (i) and which is located within a radius of fifteen (15) miles of the Shop; (ii) and which is located within fifteen (15) miles of any other then existing SpeeDee Shop; or (iii) at any other location.

3.     Franchisee acknowledges that violation of the covenants not to compete contained in this Agreement would result in immediate and irreparable injury to SpeeDee for which no adequate remedy at law will be available.  Accordingly, Franchisee hereby consents to the entry of an injunction prohibiting any conduct by Franchisee in violation of the terms of those covenants not to compete set forth in this Agreement. Franchisee expressly agrees that it may conclusively be presumed that any violation of the terms of said covenants not to compete was accomplished by and through Franchisee's unlawful utilization of SpeeDee's confidential information, know-how, methods and procedures.  Further, Franchisee expressly agrees that the existence of any claims it may have against SpeeDee, whether or not arising from this Agreement, shall not

constitute a defense to the enforcement by SpeeDee of the covenants not to compete set forth in this Agreement. Franchisee further agrees to pay all costs and expenses (including reasonable attorneys' and experts' fees) incurred by SpeeDee in connection with the enforcement of those covenants set forth in this Agreement.

      **C.**    <u>Fairness and Reasonableness</u>. Franchisee acknowledges and agrees that the covenants not to compete set forth above are fair and reasonable and will not impose any undue hardship on Franchisee, or Franchisee's shareholders or partners, if Franchisee is a corporation or partnership, since Franchisee, its shareholders or partners have other considerable skills, experience and education which afford Franchisee, its shareholders or partners the opportunity to derive income from other endeavors.

      **D.**    <u>Exclusion from Covenants</u>. Sections 14.B.1(c) and 14.B.2 shall not apply to ownership by Franchisee of less than a five percent (5%) beneficial interest in the outstanding equity securities of any publicly-held corporation.

      **E.**    <u>Independence of Covenants</u>. The parties agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement. If any or all portions of the covenants in this Article 14 is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision to which SpeeDee is a party, Franchisee expressly agrees to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Article 14.

      **F.**    <u>Modification of Covenants</u>. Except as otherwise provided herein, Franchisee understands and acknowledges that SpeeDee may modify this Agreement only upon the execution of a written agreement by SpeeDee and Franchisee.

      **G.**    <u>No Defense</u>. Franchisee expressly agrees that the existence of any claims it may have against SpeeDee, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by SpeeDee of the covenants in this Article 14.

      **H.**    <u>Additional Covenants</u>. At SpeeDee's request, Franchisee shall require and obtain execution of covenants similar to those set forth in this Article 14 (including covenants applicable upon the termination of a person's relationship with Franchisee) from any or all of the following persons: (1) all directors and managers of the Franchised Business and any other personnel employed by Franchisee who have received training from SpeeDee; (2) all officers, directors and holders of a beneficial interest of five percent (5%) or more of the securities of Franchisee and of any corporation directly or indirectly controlling Franchisee if Franchisee is a corporation; and (3) the general partners and any limited partners (including any corporation, and the officers, directors and holders of a beneficial interest of five percent (5%) or more of the securities of any corporation which controls, directly or indirectly, any general or limited partner) if Franchisee is a partnership. All covenants required by this Section 14.H shall be in forms satisfactory to SpeeDee, including, without limitation, specific identification of SpeeDee as a third party beneficiary of such covenants with the independent right to enforce them. Failure by Franchisee to obtain execution of a covenant required by this Section 14.H shall constitute a default under Article 12.

## 15.   CHANGES AND MODIFICATIONS.

      SpeeDee reserves and shall have the sole right to make changes in the Manual, the System, and the Proprietary Marks at any time and without prior notice to Franchisee. Franchisee understands and agrees that due to changes in competitive circumstances, presently unforeseen changes in the needs of customers, and/or

presently unforeseen technological innovations, the System must not remain static, in order that it best serve the interests of SpeeDee, franchisees and the System. Accordingly, Franchisee expressly understands and agrees that SpeeDee may from time-to-time change the components of the System, including but not limited to, altering the programs, services, methods, standards, forms, policies and procedures of the System; adding to, deleting from or modifying the programs, products and services which the Franchised Business is authorized to offer; and changing, improving or modifying the Proprietary Marks. Subject to the other provisions of this Agreement, Franchisee expressly agrees to abide by any such modifications, changes, additions, deletions and alterations.

16.     **TAXES AND INDEBTEDNESS.**

A.      **Payment.** Franchisee shall promptly pay, when due, all taxes levied or assessed by any federal, state or local tax authority and any and all other indebtedness incurred by Franchisee in the operation of the Franchised Business. Franchisee shall pay to SpeeDee an amount equal to any sales tax, gross receipts tax or similar tax imposed on SpeeDee with respect to any payments to SpeeDee required under this Agreement, unless the tax is credited against income tax otherwise payable by SpeeDee.

B.      **Dispute.** In the event of any bona fide dispute as to liability for taxes assessed or other indebtedness, Franchisee may contest the validity or the amount of the tax or indebtedness in accordance with procedures of the taxing authority or applicable law; provided, however, in no event shall Franchisee permit a tax sale or seizure by levy of execution or similar writ or warrant, or attachment by a creditor, to occur against the premises of the Shop or any improvements thereon.

C.      **Compliance.** Franchisee shall comply with all federal, state, and local laws, rules and regulations, and shall timely obtain any and all permits, certificates, licenses and bonds necessary for the full and proper operation and management of the Franchised Business, including, without limitation, a license to do business and provide services, fictitious name registration and sales tax permits. Copies of all subsequent inspection reports, warnings, certificates and ratings, issued by any governmental entity during the term of this Agreement in connection with the conduct of the Franchised Business which indicate Franchisee's failure to meet or maintain the highest governmental standards or less than full compliance by Franchisee with any applicable law, rule or regulation, shall be forwarded to SpeeDee by Franchisee within three (3) days of Franchisee's receipt thereof.

17.     **INDEPENDENT CONTRACTOR AND INDEMNIFICATION.**

A.      **No Agency Relationship Created.** It is understood and agreed by the parties hereto that this Agreement does not create a fiduciary relationship between them, that Franchisee shall be an independent contractor, and that nothing in this Agreement is intended to make either party an agent, legal representative, subsidiary, joint venturer, partner, employee or servant of the other for any purpose whatsoever. SpeeDee shall not have the power to hire or fire Franchisee's employees, and except as herein expressly provided, SpeeDee may not control or have access to Franchisee's funds or the expenditures thereof, or in any other way exercise dominion or control over the Franchised Business.

B.      **No Liability.** It is understood and agreed that nothing in this Agreement authorizes Franchisee to make any contract, agreement, warranty or representation on SpeeDee's behalf, or to incur any debt or other obligation in SpeeDee's name, and that SpeeDee shall in no event assume liability for or be deemed liable hereunder as a result of any such action or by reason of any act or omission of Franchisee in Franchisee's conduct of the Franchised Business or any claim or judgment arising therefrom against SpeeDee. Franchisee agrees at all times to defend, at its, his or her own cost, and to indemnify and hold harmless to the

fullest extent permitted by law, SpeeDee, its corporate parent, the corporate subsidiaries, affiliates, successors, assigns and designees of those entities, and the respective directors, officers, employees, agents, shareholders, designees, and representatives of each (SpeeDee and all other hereinafter referred to collectively as "Indemnities") from all losses and expenses incurred in connection with any action, suit, proceeding, claim, demand, investigation, or formal or informal inquiry (regardless of whether same is reduced to judgment) or any settlement thereof which arises out of or is based upon any of the following: Franchisee's alleged infringement or any other violation or any other alleged violation of any patent, trademark or copyright or other proprietary right owned or controlled by third parties; Franchisee's alleged violation or breach of any contract, federal, state or local law, regulation, ruling, standard or directive of any industry standard; libel, slander or any other form of defamation by Franchisee; Franchisee's alleged violation or breach of any warranty, representation, agreement or obligation in this Agreement; any acts, errors or omissions of Franchisee or any of its agents, servants, employees, contractors, partners, proprietors, affiliates, or representatives; latent or other defects in the Franchised Business, whether or not discoverable by SpeeDee or Franchisee; the inaccuracy, lack of authenticity or nondisclosure of any information by any customer of the Franchised Business; any services or products provided by Franchisee at, from or related to the operation of the Franchised Business; any services or products provided by any affiliated or nonaffiliated participating entity; any action by any customer of the Franchised Business; and, any damage to the property of Franchisee or SpeeDee, their agents or employees, or any third person, firm or corporation, whether or not such losses, claims, costs, expenses, damages, or liabilities were actually or allegedly caused wholly or in part through the active or passive negligence of SpeeDee or any of its agents or employees, or resulted from any strict liability imposed on SpeeDee or any of its agents or employees.

    **C.**    **Notice to Public**. Franchisee shall conspicuously identify itself and the Franchised Business and in all dealings with its customers, contractors, suppliers, public officials and others, as an independent franchisee of SpeeDee, and shall place such notice of independent ownership on all forms, business cards, stationery, advertising, signs and other materials and in such fashion as SpeeDee may, in its sole and exclusive discretion, specify and require from time-to-time in the Manual (as same may be amended from time-to-time) or otherwise.

    **D.**    **No Representations or Warranties**. Except as otherwise expressly authorized by this Agreement, neither party hereto will make any express or implied agreements, warranties, guarantees or representations or incur any debt in the name of or on behalf of the other party, or represent that the relationship between SpeeDee and Franchisee is other than that of franchisor and franchisee. SpeeDee does not assume any liability, and will not be deemed liable, for any agreements, representations, or warranties made by Franchisee which are not expressly authorized under this Agreement, nor will SpeeDee be obligated for any damages to any person or property which directly or indirectly arise from or relate to the operation of the Franchised Business franchised hereby.

## 18.    APPROVALS AND WAIVERS.

    **A.**    **Written Consent**. Whenever this Agreement requires the prior approval or consent of SpeeDee, Franchisee shall make a timely written request to SpeeDee thereof and such approval or consent shall be obtained in writing.

    **B.**    **No Waiver**. No failure of SpeeDee to exercise any power reserved to it by this Agreement, or to insist upon strict compliance by Franchisee with any obligation or condition hereunder, and no custom or practice of the parties at variance with the terms hereof, shall constitute a waiver of SpeeDee's right to demand exact compliance with any of the terms herein. Waiver by SpeeDee of any particular default by Franchisee

shall not affect or impair SpeeDee's rights with respect to any subsequent default of the same, similar or different nature, nor shall any delay, forbearance or omission of SpeeDee to exercise any power or right arising out of any breach or default by Franchisee of any of the terms, provisions or covenants hereof affect or impair SpeeDee's right to exercise the same, nor shall such constitute a waiver by SpeeDee of any right hereunder or the right to declare any subsequent breach or default and to terminate this Franchise prior to the expiration of its term. Subsequent acceptance by SpeeDee of any payments due to it hereunder shall not be deemed to be a waiver by SpeeDee of any preceding breach by Franchisee of any terms, covenants or conditions of this Agreement.

      **C.**    <u>**Right to Jury Trial**</u>. The Franchisee hereby waives any right to a jury trial with respect to this Agreement and/or any matters arising hereunder.

**19.**    <u>**NOTICE.**</u>

      All notices or communications required or permitted hereunder shall be in writing and shall deemed duly given if delivered, personally, by hand, sent by registered or certified mail, return receipt requested, first class postage prepaid, or by recognized carrier (such as United Parcel Service or Federal Express), by facsimile or by electronic mail to the address set out below.

      A.  If to SpeeDee:
          SpeeDee Worldwide Corporation
          4300 TBC Way
          Palm Beach Gardens, Florida 33410
          Attention:  General Counsel
          Telephone: (561) 383-3100
          Facsimile:  (800) 867-0385
          Electronic Mail:  speedee@speedeecorp.com

      B.  If to Franchisee:
          Margaret P. Chow, Dan Nguyen; and
          MCC INVESTMENTS, INC.
          390 El Camino Real
          Millbrae, California 94030
          Attn: Margaret P. Chow; Dan Nguyen
          Telephone:_____
          Facsimile:_____
          Electronic Mail: "_____"

    with a copy (which shall not constitute notice) to:

          Margaret P. Chow
          93 San Jacinto Way
          San Francisco, California 95127
          Facsimile: _____
          Electronic Mail: "_____"

And a copy to:

> Dan Nguyen
> 29 Fuente Avenue
> San Francisco, California 94132

Notices shall be deemed delivered when deposited in the United States mail and/or as above provided, effective upon the date of confirmed receipt or refusal of delivery. Change of address by either party must be by notice given to the other in the same, manner as above specified.

20. **RELEASE OF PRIOR CLAIMS.**

By executing this Agreement, Franchisee, individually and on behalf of Franchisee's heirs, legal representatives, successors and assigns, and each assignee of this Agreement by accepting assignment of the same, hereby forever releases and discharges SpeeDee and its officers, directors, employees, agents and servants, including SpeeDee's subsidiary and affiliated corporations, their respective officers, directors, employees, agents and servants, from any and all claims relating to or arising under any franchise agreement or any other agreement between the parties executed prior to the date of this Agreement including, but not limited to, any and all claims, whether presently known or unknown, suspected or unsuspected, arising under the franchise, securities or antitrust laws of the United States or of any state, province or territory thereof.

21. **DISCLOSURE STATEMENT AND DISCLAIMER.**

A. **Compliance with Applicable Laws**. Franchisee acknowledges, by its signature hereto and the execution of Exhibit D attached hereto, that it received from SpeeDee a Franchise Disclosure Document for the State in which the Franchised Business will be located, or Franchisee's place of residence, as appropriate, at least fourteen (14) calendar days prior to the execution of this Agreement. Nothing in this Agreement or any related agreement is intended to disclaim SpeeDee's representations made in the Franchise Disclosure Document delivered to Franchisee or its representatives. Franchisee acknowledges that it received from SpeeDee this Agreement with all blanks filled in, the Exhibits hereto, if any, and agreements relating thereto, if any, at least seven (7) calendar days prior to the execution of this Agreement.

B. **Acknowledgement**. Franchisee acknowledges and accepts the following:

THE SUCCESS OF FRANCHISEE IN OWNING AND OPERATING A FRANCHISE IS SPECULATIVE AND WILL DEPEND ON MANY FACTS INCLUDING, TO A LARGE EXTENT, FRANCHISEE'S INDEPENDENT BUSINESS ABILITY. THIS OFFERING IS NOT A SECURITY AS THAT TERM IS DEFINED UNDER APPLICABLE FEDERAL AND STATE SECURITIES LAWS. THE OBLIGATION TO TRAIN (EXCEPT FOR TRAINING SPECIFICALLY REQUIRED BY THIS AGREEMENT), MANAGE, PAY, RECRUIT AND SUPERVISE EMPLOYEES OF THE FRANCHISED BUSINESS RESTS SOLELY WITH FRANCHISEE. FRANCHISEE HAS NOT RELIED ON ANY WARRANTY OR REPRESENTATION, EXPRESSED OR IMPLIED, AS TO THE POTENTIAL SUCCESS OR PROJECTED INCOME OF THE BUSINESS VENTURE CONTEMPLATED HEREBY. NO REPRESENTATIONS OR PROMISES HAVE BEEN MADE BY SPEEDEE TO INDUCE FRANCHISEE TO ENTER INTO THIS AGREEMENT EXCEPT AS SPECIFICALLY INCLUDED HEREIN. SPEEDEE HAS NOT MADE ANY REPRESENTATION, WARRANTY OR GUARANTY, EXPRESS OR IMPLIED, AS TO THE POTENTIAL REVENUES,

PROFITS OR SERVICES OF THE BUSINESS VENTURE TO FRANCHISEE AND CANNOT, EXCEPT UNDER THE TERMS OF THIS AGREEMENT, EXERCISE CONTROL OVER FRANCHISEE'S BUSINESS. FRANCHISEE ACKNOWLEDGES AND AGREES THAT IT HAS NO KNOWLEDGE OF ANY REPRESENTATION MADE BY SPEEDEE OR ITS REPRESENTATIVES OF ANY INFORMATION THAT IS CONTRARY TO THE TERMS CONTAINED HEREIN.

22.    **ENTIRE AGREEMENT**.

This Agreement, the documents referred to herein (including, without limitation, the ACH Agreement, the Option and Shop Lease and Option for Assignment of Lease), and the Exhibits or Addendum hereto, if any, constitute the entire, full, and complete agreement between SpeeDee and Franchisee concerning the subject matter hereof, and supersede all prior agreements, no other representations having induced Franchisee to execute this Agreement. No representations, inducements, promises, or agreements, oral or otherwise, not embodied herein or attached hereto (unless of subsequent date) were made by either party, and none shall be of any force or effect with reference to this Agreement or otherwise. No amendment, change, or variance from this Agreement shall be binding on either party unless mutually agreed to by the parties and executed by their authorized officers or agents in writing. Notwithstanding the foregoing, nothing in this Agreement shall disclaim or require Franchisee to waive reliance on any representation made by SpeeDee in its most recent disclosure document (including exhibit and amendments) delivered to Franchisee or its representative.

23.    **SEVERABILITY AND CONSTRUCTION.**

A.    **Severability**. Except as expressly provided to the contrary herein, each section, part, term, and/or provision of this Agreement shall be considered severable; and if, for any reason, any section, part, term, and/or provision herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation by a court or agency having valid jurisdiction, such shall not impair the operation of, or have any other effect upon, such other portions, sections, parts, terms, and/or provisions of this Agreement as may remain otherwise intelligible, and the latter shall continue to be given full force and effect and bind the parties hereto; and said invalid sections, parts, terms, and/or provisions shall he deemed not to be a part of this Agreement; provided, however, that if SpeeDee determines that such finding of invalidity or illegality adversely affects the basic consideration of this Agreement, SpeeDee, at its option, may terminate this Agreement.

B.    **No Third Party Rights**. Nothing in this Agreement is intended, nor shall be deemed, to confer upon any person or legal entity other than SpeeDee or Franchisee and such of their respective successors and assigns as may be contemplated by Article 11, any rights or remedies under or by reason of this Agreement.

C.    **Captions**. All captions in the agreement are intended solely for the convenience of the parties, and none shall be deemed to affect the meaning or construction of any provisions hereof.

D.    **References**. All references herein to the masculine, feminine, neuter, or singular shall be construed to include the masculine, feminine, neuter, or plural, where applicable, and all acknowledgements, promises, covenants, agreements, and obligations herein made or undertaken by Franchisee shall be deemed jointly and severally undertaken by all the parties hereto on behalf of Franchisee.

E.    **Counterparts**. This Agreement may be executed in counterparts, and each copy so executed shall be deemed an original.

24.   **APPLICABLE LAW.**

   **A.**   **Rights Not Exclusive**.  No right or remedy conferred upon or reserved to SpeeDee or Franchisee by this Agreement is intended to be, nor shall be deemed, exclusive of any other right or remedy herein or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy.

   **B.**   **Injunctive Relief**.  The provisions of Article 25 shall not bar the right of either party to obtain injunctive relief against threatened conduct that will cause it loss or damages, under the usual equity rules, including the applicable rules for obtaining restraining orders and preliminary injunctions.  Franchisee acknowledges that any failure to comply with the requirements of this Agreement, including, but not limited to, Section 8.A and Article 13 will cause SpeeDee irreparable injury.

   **C.**   **Governing Law**.  This Agreement takes effect upon its acceptance and execution by SpeeDee. This Agreement shall be interpreted and construed under the laws of the State of Illinois, which laws shall prevail in the event of any conflict of law, except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. Section 1051 et seq.).

   **D.**   **Attorneys' Fees**.  In the event that any action or proceedings is filed by one party against the other party to enforce or defend any of the covenants or conditions hereto, the party in whose favor final judgment shall be entered shall be entitled to recover from the other reasonable attorneys' fees and related litigation costs and expenses, to be set and ordered by the court in which the judgment is entered.

25.   **DISPUTE RESOLUTION.**

Except as specifically otherwise provided in this Agreement, the parties agree that any and all disputes between them and any claim by either party that cannot be amicably settled shall be determined by Arbitration in Chicago, Illinois.  If Arbitration is selected as a method of resolution, the rules of the American Arbitration Association shall apply.  Said rules are hereby modified to provide that each party shall be entitled to conduct discovery in accordance with the Federal Rules of Civil Procedure.  Upon the demand of either party to any dispute for arbitration, each shall select a representative to act in its behalf.  The two elected representatives shall meet within two weeks of the time demand is made, unless the parties otherwise agree in writing.  The two representatives shall agree upon a single arbitrator (the "Arbitrator").  The Arbitrator shall hear the dispute in Chicago, Illinois and may properly consider any and all matters related thereto that would be admissible in a non-jury trial under applicable Federal Rules of Civil Procedure or Evidence.  The Arbitrator's award shall be announced promptly and shall include all fees, costs and attorneys' fees to the prevailing party.  Judgment upon the award of the Arbitrator shall be binding and shall be entered in a court of competent jurisdiction.

26.   **ACKNOWLEDGEMENTS.**

   **A.**   **Independent Investigation**.  Franchisee acknowledges that it has conducted an independent investigation of the business franchised hereunder, and recognizes that the business venture contemplated by this Agreement involves business risks and that its success will be largely dependent upon the ability of Franchisee as an independent businessman.  SpeeDee expressly disclaims the making of, and Franchisee acknowledges that it has not received, any warranty or guaranty, express or implied, as to the potential volume, profits, or success of the business venture contemplated by this Agreement.

    **B.**    <u>Understanding of Agreement</u>. Franchisee acknowledges that it has received, read, and understood this Agreement and the Exhibits or Addendum hereto, if any; and that SpeeDee has fully and adequately explained the provisions of each to Franchisee's satisfaction; and that SpeeDee has accorded Franchisee ample time and opportunity to consult with advisors of its own choosing about the potential benefits and risks of entering into this Agreement.

    The parties hereto have duly executed and delivered this Agreement on the day and year first above written.

FRANCHISOR:

SPEEDEE WORLDWIDE CORPORATION

By: _____

  Lynn Parker, Chief Operating Officer

FRANCHISEE:
MCC INVESTMENTS, INC.

By _____
Margaret P. Chow, President

_____
Margaret P. Chow, Individually

_____
Dan Nguyen, Individually

## EXHIBIT A

### DESIGNATED TRADE AREA

1.      Local Franchisee shall do business as "SpeeDee Oil Change & Tune-Up #17-021

2.      In accordance with Section 1.B of this Agreement, the exact address of the SpeeDee Oil Change & Tune-Up shall be: **390 El Camino Real, Millbrae, CA.**

~~EXHIBIT B~~

~~SITE SELECTION ADDENDUM~~

## NOT APPLICABLE TO MCC INVESTMENTS, INC.

This Addendum is made this ____ day of _____, 2012, by and between SpeeDee Worldwide Corporation ("SpeeDee") and _____ (the "Franchisee").

WHEREAS, SpeeDee and Franchisee, are parties to a SpeeDee Worldwide Corporation Franchise Agreement entered into on _____, 2012, ("Franchise Agreement") by the terms of which SpeeDee has granted to Franchisee the right and license to operate a SPEEDEE OIL CHANGE & TUNE-UP (the "Shop") franchise pursuant to SpeeDee's system and proprietary marks;

WHEREAS, the Franchise Agreement imposes on Franchisee an obligation to select and present a site for SpeeDee's approval ("Approved Location") within one hundred eighty (180) days of the execution of the Agreement; and

WHEREAS, Franchisee has selected and presented a site to SpeeDee which has been approved by SpeeDee.

NOW, THEREFORE, the parties hereto, intending to be bound, agree as follows:

1.    <u>Approved Location</u>.  The Approved Location within the Designated Trade Area shall be located as follows:

_____

2.    <u>Franchisee's Representations and Warranties For Leased Site</u>.  If the Approved Location is leased by Franchisee, Franchisee represents and warrants that it has executed a lease for the premises upon which the Shop is located, a copy of which has been provided to SpeeDee and which includes the following terms and conditions:

a.    That the initial term of the lease, or the initial term together with any renewal terms (for which rent shall be set forth in the lease), shall be for not less than fifteen (15) years;

b.    That the lessor consents to Franchisee's use of such Proprietary Marks and initial signage as SpeeDee may prescribe for the Shop;

c.    That the use of the premises be restricted solely to the operation of the Shop;

d.    That Franchisee be prohibited from subleasing or assigning all or any part of its occupancy rights or extending the term of or renewing the lease without SpeeDee's prior written consent;

e.    That the lessor provide to SpeeDee any and all notices of default under the lease;

f.    That SpeeDee has the right to enter the premises to cure any default under the Franchise Agreement;

g.    That Franchisee shall not be deemed in default under the lease so long as SpeeDee has commenced efforts to cure a default thereunder by Franchisee within the cure period specified in the Lease and is continuing diligent efforts to cure such default; and

h.    That SpeeDee or SpeeDee's designee have the option, but not the obligation, upon default, expiration, or termination of the Franchise Agreement, and upon notice to the lessor, to assume all of Franchisee's rights under the lease

terms or bank terms, including the right to assign or sublease. Franchisee will execute the "Option For Assignment of Lease" (as defined in the Franchise Agreement).

3.    <u>Franchisee's Representations and Warranties For Owned Site</u>. If the Approved Location is owned by Franchisee, Franchisee represents and warrants that it has purchased the real estate upon which the Shop is located and has provided SpeeDee with a copy of the deed for the real estate. Franchisee further covenants that it will execute the "Option and Shop Lease" (as defined in the Franchise Agreement).

4.    <u>Approved Location</u>. The Approved Location described in paragraph 1 hereof shall constitute the Approved Location referred to in Section 1.B of the Franchise Agreement. **Site selection approval by SpeeDee shall in no way be deemed a representation, warranty or guaranty of the success of the Shop at the Approved Location.**

5.    <u>Miscellaneous</u>.

a.    All capitalized terms not defined herein shall have the meaning given them in the Franchise Agreement.

b.    This Site Selection Addendum constitutes an integral part of the Franchise Agreement between the parties hereto, and the terms of this Site Selection Addendum shall be controlling with respect to the subject matter hereof. Except as modified or supplemented by this Site Selection Addendum, the terms of the Franchise Agreement are hereby ratified and confirmed.

The parties hereto have duly executed and delivered this Addendum on the day and year first above written.
FRANCHISOR:

SPEEDEE WORLDWIDE CORPORATION

By:    **N/A**
Name: _____
Its: _____

FRANCHISEE:

By: _____ **N/A** _____
Name: _____
Its: _____

_____
_____, Individually

## EXHIBIT C

### ENTITY FRANCHISE SUPPLEMENT

WHEREAS, Margaret P. Chow, Dan Nguyen and MCC Investments, Inc. desire to obtain (or have heretofore obtained) a franchise to establish and operate a SpeeDee Oil Change & Tune-Up Center under a franchise agreement (hereinafter the "Franchise Agreement") to be granted (or heretofore granted) by SpeeDee Worldwide Corporation ("SpeeDee") for the franchise premises located at **390 El Camino Real, Millbrae, CA** ("Shop").

WHEREAS, SpeeDee requires as a condition of granting (or maintaining) said franchise certain personal guaranties and undertakings of one or more individuals, as hereinafter set forth:

NOW THEREFORE, in consideration of the agreements by SpeeDee in the Franchise Agreement, and other valuable consideration, Franchisee, and the undersigned individuals, hereby represent and agree to and with SpeeDee as follows:

1.    The franchise entity is (check one):

          _____X_____ a corporation

          _____ a limited liability company

          _____ a limited liability partnership

          _____ a general partnership

          _____ a limited partnership

          _____ other (please explain in a separate supplement)

2.    If Equity Interests are in the form of share or units, state:

          _____ number of authorized shares or units

          _____1,000,000_____ number of outstanding shares or units

3.    The owners of the Equity Interests in the franchise entity and his/her respective Equity Interests are:

| Name | Owners | Number of Shares or Units   Or | Percentage Interest |
|------|--------|---------------------------|---------------------|
| Margaret P. Chow | | | 80% |
| Dan Nguyen | | | 20% |
| | | | |
| | | | |

4.    The following named shareholders, members or other partners are hereby designated by Franchisee to serve as manager of the Shop and to perform the duties set out in the Franchise Agreement: Margaret P. Chow and Dan Nguyen. Said named shareholders, members or other partners agree, jointly and individually, to assume and perform said duties.

5.      The undersigned shareholders, members or other partners of Franchisee hereby, jointly and individually, guarantee fully the performance by Franchisee, of all its obligations and agreements to be performed by Franchisee under the Franchise Agreement.  This guarantee shall extend to all extensions and renewals of said Franchise Agreement. Notice of any default is waived and consent is hereby given to all extensions of time that may be granted by SpeeDee.

6.      The undersigned shareholders, members or other partners of Franchisee hereby recognize and agree that the service mark, logo and business systems licensed to Franchisee under said Franchise Agreement, shall and may be used solely for the business of operation the Shop at the Approved Location, and shall not be used by the undersigned individually, or by Franchisee, for any purpose or in any manner, not first authorized in writing by SpeeDee.

7.      The undersigned shareholders, members or other partners of Franchisee further agree that the agreements of Franchisee set out in the Franchise Agreement shall apply to the undersigned individually, with the same force and effect, as if the undersigned were named as individual Franchisees in the Franchise Agreement, and the undersigned shall be individually and jointly bound by, and comply with, the Franchise Agreement.

The undersigned have hereunder set their hands and seals the 5th day of March, 2012.

FRANCHISEE:

MCC INVESTMENTS, INC.

_____
Margaret P. Chow, President

_____
Margaret P. Chow, Individually

_____
Dan Nguyen, Individually

390 El Camino Real, Millbrae. CA/17-021
FA – Spring 2012

44

## EXHIBIT D

### STATEMENT OF PROSPECTIVE FRANCHISEE
### APPLICABLE TO MARGARET P. CHOW

**The following dates are true and correct:** (NOTE: Dates and answers must be completed in the prospective franchisee's <u>own</u> handwriting.)

_3/15_, 20 _13_

Initials _me_

The date of my first face-to-face meeting with a SpeeDee Worldwide Corporation ("SpeeDee") representative.

_3/15_, 20 _13_

Initials _mc_

The date on which I received a Franchise Disclosure Document about the SpeeDee Oil Change & Tune-Up Franchise.

_3/15_, 20 _13_

Initials _mc_

The date when I received a fully completed copy (other than signatures) of the Franchise Agreement I later signed.

_3/15_, 20 _13_

Initials _mc_

The earliest date on which I signed the Franchise Agreement or any other binding document (not including the Franchise Disclosure Document Receipt).

_3/15_, 20 _13_

Initials _mc_

The earliest date on which I delivered cash, check or other consideration to SpeeDee.

**Representations:**

No promises, agreements, contracts, commitments, representations, understandings, "side deals," options, rights-of-first-refusal or otherwise have been made to or with me with respect to any matter (including but not limited to any representations or promises regarding advertising [television or otherwise], marketing, site location, operational assistance or otherwise) nor have I relied in any way on any such except as explicitly set forth in the Franchise Agreement or a written Addendum thereto signed by me and an authorized representative of SpeeDee except as follows:_____

(If none, the Prospective Franchisee shall write NONE in his/her own handwriting and initial.)

No oral, written or visual claim or representation, promise, agreement, contract, commitment, understanding or otherwise which contradicted, expanded upon or was inconsistent with the Franchise Disclosure Document was made to me by any person or entity except as follows:_____

(If none, the Prospective Franchisee shall write NONE in his/her own handwriting and initial.)

No oral, written, visual or other claim or representation (including but not limited to charts, tables, spreadsheets or mathematical calculations) which stated or suggested any specific level or range of actual or potential sales, costs, income, expenses, profits, cash flow, tax effects or otherwise (or from which such items might be ascertained) was made to me by any person or entity, except as follows:_____

(If none, the Prospective Franchisee shall write NONE in his/her own handwriting and initial.)

No contingency, condition, prerequisite, prior requirement, proviso, reservation, impediment, stipulation, provision or otherwise exists with respect to any matter (including but not limited to obtaining financing, selection, purchase, lease or otherwise of a site, operational matters or otherwise) and/or with respect to my fully performing all of my obligations under the Franchise

Agreement and/or any other documents to be executed by me nor have I relied in any way on any such, except as explicitly set forth in the Franchise Agreement or a written Addendum thereto signed by me and an authorized representative of SpeeDee, except as follows:_____

_____

(If none, the Prospective Franchisee shall write NONE in his/her own handwriting and initial.)

SpeeDee does not make or endorse nor does it allow any marketing representative, broker or other individual to make or endorse any oral, written, visual or other claim or representation (including but not limited to charts, tables, spreadsheets or mathematical calculations) which state or suggest any specific level or range or actual or potential sales, costs, income, expenses, profits, cash flow, tax effects or otherwise (or from which such items might be ascertained) with respect to this or any other franchise, whether made on behalf of or for SpeeDee, any franchisee or other individual, and expressly disclaims any such information, data or results.

In addition, SpeeDee does not permit any promises, agreements, contracts, commitments, representations, understandings, "side deals," options, rights-of-first-refusal or otherwise or variations of, changes in or supplements to the Franchise Agreement or the existence of any contingencies or conditions to Franchisee's obligations except by means of a written Addendum signed by Franchisee and SpeeDee.

**If any such representations, "side deals," contingencies or otherwise have been made to you by any person or otherwise exist, immediately contact SpeeDee's corporate office.**

The Prospective Franchisee understands and agrees to all of the foregoing and certifies that all of the above statements are true, correct and complete.

Date ___2/15/17___

PROSPECTIVE FRANCHISEE:

MCC INVESTMENTS, INC.

_____
Margaret P. Chow, President

_____
Margaret P. Chow, Individually

All of the above is true, correct and complete to the best of my knowledge.

Approved:

SPEEDEE WORLDWIDE CORPORATION

By: _____
Lynn Parker, Chief Operating Officer

**EXHIBIT C**
Franchise Work Schedule for the week of 5/16/13

- COMPLAINT -

## Millbrae SpeeDee Work Schedule – Effective 5/16/2013

| | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | Sunday |
|---|---|---|---|---|---|---|---|
| Julio | 8-5 | 8-5 | OFF | 10-6 | 9-6 | 10-6 | ON CALL |
| Luis | 9-5 | 9-5 | 9-5 | 9-5 | OFF | 8-5 | OFF |
| Kenny | 1-6 | OFF | 1-6 | OFF | 8-5 | 9-6 | 10-4 |
| Francis | OFF | 8-4 | 8-4 | 8-5 | 8-5 | 8-5 | 10-4 |
| Stanley | 1-6 | 2:30-6 | 1-6 | OFF | 1-6 | OFF | OFF |
| Herman | 8-1 | OFF | 8-1 | OFF | 8-1 | OFF | OFF |
| Chris (smog tech) | 8-4 | 8-4 | 9-4 | 8-4 | 9-4 | 9-5 | OFF |
| Jimmy | OFF | OFF | OFF | OFF | OFF | 8-6 | 10-4 |
| Allen | 10-2 | 10-6 | 10-2 | 10-6 | 10-2 | OFF | OFF |
| Vanessa | 8-4:30 | 8-4:30 | 8-4:30 | 8-4:30 | 8-4:30 | OFF | OFF |
| Sherly | OFF | OFF | OFF | OFF | OFF | 8-4 | 10-4 |

NOTE: SAFETY IS THE OVERRIDEN PRIORITY! PLEASE REPORT TO WORK 5MIN PRIOR TO

**EXHIBIT D**
Misappropriated Check

- COMPLAINT -



**<u>EXHIBIT E</u>**
Release of Interest in Franchise Business of MCC Investments,
Inc. dba Speedee Oil Change & Tune Up Email Franchisor

- COMPLAINT -

## RELEASE OF INTEREST IN FRANCHISE BUSINESS OF
## MCC INVESTMENTS, INC. dba SPEEDEE OIL CHANGE & TUNE UP

### 1. REPRESENTATIONS

**MARGARET CHOW** and **DAN NGUYEN** have entered into an agreement on this 9th day of July 2013 with respect to **MCC Investments, Inc. dba SpeeDee Oil Change & Tune-Up** located at **390 El Camino Real, Millbrae, CA 94030** as follows:

      **DAN NGUYEN** has agreed that he will withdraw his name as a franchisee or guarantor in the business of **MCC Investments, Inc. dba SpeeDee Oil Change & Tune-Up** located at **390 El Camino Real, Millbrae, CA 94030,** as well as forego any interest in said business during and after his term of employment, and in consideration thereof **MARGARET CHOW** has agreed to release and indemnify **DAN NGUYEN** from any debts or obligations incurred by **MCC Investments, Inc. dba SpeeDee Oil Change & Tune-Up** located at **390 El Camino Real, Millbrae, CA 94030.**

### 2. EFFECTIVE DATE OF RELEASE

This agreement shall be effective, and is signed and executed, on this the **9th** day of **July, 2013.**

By:_____*Refused !*_____ **DAN NGUYEN**

By:_____ **MARGARET CHOW**

1

## **EXHIBIT F**

Correspondence from Mr. Jon Brown, District Manager for
Franchisor

**From:** Jon Brown <JBrown@speedeecorp.com>
**Date:** April 1, 2013 at 1:01:14 PM PDT
**To:** Dan Nguyen <buudan1@gmail.com>
**Cc:** Mike Guasch <MGuasch@speedeecorp.com>
**Subject: Millbrae's Weekly Sales.xls**

Margaret & Dan;
First of all welcome to the SpeeDee family and I'm looking forward to a long and successful relationship with the both of you. Attached to this email is your Weekly Sales Tracking Spread Sheet, it has been updated through the 1st quarter of 2013. Currently you are up in total sales 70% and up in car count 25% over 2012. Congratulation to both of you and your entire staff and as always if you need anything from either myself or Mike Guasch please don't hesitate to call.

Keep up the good work,


Jon Brown
District Manager, West
SpeeDee Worldwide Corporation

This email and any attachment is for authorized use by the intended recipients only, which include Speedee employees. It may contain proprietary material, confidential information and/or be subject to legal privilege. It should not be copied, disclosed to, retained or used by, any other party. If you are not an intended recipient then please promptly delete this email and any attachment and all copies and inform the sender.